GIBSON COUNTY *v.* PULLMAN SOUTH. CAR CO.

*(Circuit Court, W. D. Tennessee.   April 28, 1890.)*

1. CONSTITUTIONAL LAW—TAXATION—INTERSTATE COMMERCE—SLEEPING-CARS.
    Where Pullman sleeping-cars are run wholly within a state, the business may be taxed as a privilege.
2. SAME—PROPERTY OWNED OUTSIDE THE STATE.
    The only restriction upon this power must be found in the state and federal constitutions, since every state may tax all property found within its borders, whether owned by its own citizens or foreigners, although considerations of amity and comity usually secure the exemption of property only temporarily situated within the state, while our federal constitution forbids discriminations against citizens of other states of this Union.
3. SAME—DISCRIMINATION—EXEMPTIONS.
    Where it does not appear whether sleeping-cars owned by the railroad company are exempt from taxation, an act of the legislature will not be held to make a discrimination, because they are not specifically taxed as a privilege, like those run independently by others than the railroad company, because they may be otherwise equally taxed along with other property of the railroad company, or lawfully exempt under charter privileges.
4. SAME—CONSTRUCTION OF ACT—COUNTIES.
    The act of the legislature of Tennessee of 1877 (chapter 16) does not impose, when properly construed, a privilege tax for counties upon sleeping-cars run wholly within the state, but is confined to one privilege tax for the state.
5. SAME—COUNTIES—PRIVILEGE TAX.
    There is in Tennessee no statute, either in the Code or elsewhere, which authorizes counties, generally, to levy always, if they choose, the same privilege tax which is provided for the state.   It depends upon each taxing statute and its amendments whether the county has this power.   It is generally conferred, but not always, and was not in the several acts taxing sleeping-cars as a privilege.
6. SAME—TITLE OF ACT.
    The Tennessee constitution, (article 2, § 17,) which provides that no bill shall become a law which embraces more than one subject, that subject to be expressed in its title, does not require a taxing act to name in the title all the objects of taxation, nor confine the act to one general class of property, if the title be broad enough to cover other classes.   The tax on sleeping-cars levied by Acts 1877, c. 16, and Acts 1881, c. 149, is not void because of any defect in the title, which expressed only the one subject of "taxation" with which the acts dealt.

In Equity.

This bill was filed by Gibson county, Tenn., to recover of the Pullman Car Company a privilege tax of $50, and $75 on each of its sleeping-cars run through Gibson county on the Louisville & Nashville and the Mobile & Ohio Railroads, for the years 1877 to 1883, inclusive, amounting, with interest and penalties, to $5,102.50.   The tax was levied under authority of the Code of Tennessee, which it was claimed authorized all counties in the state to levy the same privilege taxes as were levied by the state by the acts of March 9, 1877, c. 16, and of April 7, 1881, c. 149. Afterwards, the claim was abandoned as to all sleeping-cars run from another state into Tennessee, or from that state into another; and the bill was amended to demand it only for the two cars run daily between the cities of Memphis and Nashville, and wholly within the state, and through Gibson county, upon which the state had levied and collected the tax prescribed by the acts of the legislature.   The agreed statement of facts showed that the defendant's two cars passed daily through Gibson county, taking up and putting off at the stations within that county all such passengers as wished sleeping-car accommodations, issuing upon the train

such tickets as were required, or taking such fares as were charged. The sleeping-car company kept no agents at the stations, and only did business as above described. There were other facts, some of which were not agreed upon, but the foregoing were stated by the court as sufficient for disposing of the case.

*James R. Deason*, for plaintiff.

*William Burry*, for defendant.

HAMMOND, J. The trouble about this case has been that, while it has been submitted upon bill, answer, exhibits, and an agreed statement of facts, the parties have not come to an agreement as to all the facts, and have been somewhat disagreed about them, which disagreement has not been settled by the proof, nor the pleadings, as the court understands their force and effect. Nevertheless, the court will now dispose of it solely upon the facts that have been agreed in their relation to the pleadings.

It must be conceded that the state of Tennessee had the right to tax the two sleeping-cars engaged in business between Nashville and Memphis, wholly within the state, and that, so far as the federal authority is concerned, that power of taxation is plenary. The authorities need not be cited here, since it is not necessary to support the concession made to the plaintiff on that point, and the cases in the supreme court upon the subject of state taxation, in its relation to interstate commerce, are far too numerous and well known to require any especial application of them to this case. The very latest of them cites the others, and fully establishes this ruling. *Western Union Tel. Co.* v. *Alabama State Board*, 132 U. S. 472, 10 Sup. Ct. Rep. 161. It may be well enough, however, to remark in this connection that we start out, always, with the foundation principle that every state, exercising the sovereign power of taxation, may tax all articles of property found within its borders, and all business carried on there, whether owned and done by its own citizens or foreigners. The protection given while within the state is the consideration received for the contribution by taxation to the exchequer of the power that protects, and the fact that the same property or business may be taxed by the home power of the foreigner, because of its authority over him and his property wherever situated, does not impose any restriction on the taxing power of the state where the property is situated or the business carried on by him. That fact, and other considerations of amity and comity among nations, induce each to withhold, generally, any taxation of articles or business done which are merely in transit through the territory, or temporary in character; but such exemption is purely voluntary and gracious, except so far as mutual benefits derived from civilized international intercourse may influence it. The only restrictions upon this plenary power of the state of Tennessee must be found in its own constitution and that obligation of obedience it owes to the constitution of the United States. There being no discrimination, in the statutes involved here, against the property or business of the citizens of other states, and the business of running cars to furnish sleeping and other comfortable

accommodations to passengers between Nashville and Memphis, wholly within this state, being domestic, and not interstate, commerce, there cannot be said to be any violation of the federal constitution in exercising the taxing power by them.

It is urged against these statutes that this tax discriminates against the defendant in favor of the railroads, because their sleeping-cars are not also taxed; and, under a similar act and a similar constitution, it was so held in Texas. *Car Co.* v. *Texas*, 64 Tex. 274. The act took this form, probably, because it had been so repeatedly held that cars run independently of the railroads, as these were, could not be included in a taxation of the railroad property; and, if similar cars belonging to the railroad company or used by it were also taxed as the defendant is, it would be double taxation. But the fact does not appear here, and the court does not know how it may be, whether sleeping-cars belonging to or otherwise used by a railroad company, and engaged wholly in domestic commerce, have been otherwise taxed or not, or whether they have been otherwise equally taxed, or whether, if not taxed, the exemption be the lawful exercise of some power to exempt from taxation. Therefore our opinion is reserved on this point, and we are content, for the purposes of this case, to accept the ruling of *Car Co.* v. *Gaines*, 3 Tenn. Ch. 587, which was, possibly, approved by the supreme court in *Robbins* v. *Taxing Dist.*, 13 Lea, 309.

We do not think the objection to the title is well taken. Wise as the provision of our constitution may be, that "no bill shall become a law which embraces more than one subject, that subject to be expressed in the title," it is not wise to tie the hands of the legislature, and embarrass its reasonable freedom of action by subtile distinctions as to subject-matter which shall make almost all legislation impossible. Const. Tenn. art. 2, § 17. By a kind of metaphrastic process of interpreting the words used by a body of men dealing with language in its ordinary meaning among practical men, not given to technical distinctions, and by hypercritical holding to subtile discriminations in physical and other sciences, learned or astute minds may bring "more than one subject" into almost any act of legislation, and, more easily still, may not always find the subject-matter accurately "expressed in the title," and thus defeat every displeasing or unsatisfactory statute. All that can be required is a reasonable observance of the rule that there shall be only one subject, whether general or special, and this shall be expressed in the title. *Hyman* v. *State*, 87 Tenn. 109, 112, 9 S. W. Rep. 372.

Whether a revenue act be one with the widest scope upon the general subject, or one for a very special and limited purpose, the subject is raising revenue by taxation; and when the title is "An act declaring the mode and manner of valuing the property of telegraph companies for taxation, and of taxing sleeping-cars," that title expresses the subject, and the act does not "embrace more than one subject,"—that of "taxation," namely. Act 1877, c. 16, p. 26. It has two objects in view, no doubt, but not two subjects. Its purpose is to tax two different things, but the subject-matter of consideration by the legislators was that

of taxation expressed in the title. The fact that this subject was considered in its especial relation to telegraph property and sleeping-cars did not impose any further or other restriction on the legislature as to subject-matter and title than would have existed if it had been considering a general revenue law under that title, and had associated these two objects of taxation with innumerable others, as learned counsel seem to concede might have been done. Our supreme court has so decided, at all events. *Cannon* v. *Mathes*, 8 Heisk. 504; *State* v. *Whitworth*, 8 Lea, 594. The case of *Hyman* v. *State*, 87 Tenn. 109, 9 S. W. Rep. 372, only decides that, if the legislature adopt a special title, and deal only with a branch or subdivision of some general subject comprehended within the special title, that title so limited will not embrace and support an amendatory act enlarging the legislation to include another branch of the same general subject, wholly different from that contained in the original act. That is to say, the legislature might not enlarge its objects of taxation by ingrafting on this act of 1877, for example, under this same title, other and distinct objects of taxation; but that is not saying that, this title being special, the act cannot unite the two branches or subdivisions of the same subject-matter contained in it, both being covered by the special title. The principle is that the title must be broad enough to cover the subject-matter and all its subdivisions included in the act. If the legislature chooses to limit the title, it must limit the act within the title; but if it enlarges the title sufficiently it may take in all that which the title comprehends, if it be upon the same general subject, which must be only one subject. The title must be broad enough to cover the whole subject of the act in all its divisions, but there need not be a separate act for each subdivision. It is only the application of the rule that the less does not include the greater to the art of giving titles to statutes, under our constitution; but this decision does not conflict with the others. The rule to be learned in that act from them all is to use broad titles for the statutes, and not to endanger them by too great particularity of expression, lest we take the subject of the act out of the title, rather than put it within.

But we do not think this Act of 1877, c. 16, conferred upon the county plaintiff the right to impose the taxes claimed by the bill upon the defendant company, nor did it have that authority under any general law. The contention for this depends, confessedly, upon an implication that whenever the state declares a privilege, and taxes it as such, the county may do likewise. There is no statute declaring this rule, and no decision has been cited which sustains it. Neither *Cannon* v. *Mathes*, 8 Heisk. 512; *Wilson* v. *Benton*, 11 Lea, 51; nor *Dun* v. *Cullen*, 13 Lea, 202,—so decides. In the first the suit included taxes for county purposes, no doubt, but this question was not even mooted, and, if it arose at all, was passed *sub silentio*. Upon examination, it will be found that the act referred to of July 7, 1870, c. 74, was only one increasing a rate before that levied by a revenue statute passed February 25, 1870, c. 81, which in terms applied to "taxation for all state and county purposes" by its first section. The later act was only an amendment of the older one,

and therefore the statutes involved in that case in their terms applied to counties. The same thing is true precisely of the Act of 1879, c. 79, referred to in *Wilson* v. *Benton*, 11 Lea, 51; and in *Dun* v. *Cullen*, 13 Lea, 202. The very act, upon the face of it, is for county purposes as well as state, and its second section specifically levies the county taxes on property, and by fair implication a similar tax is authorized on privileges, when it is taken in connection with its companion act, immediately preceding it, for the assessment of taxes "for state, county, and municipal purposes," the forty-sixth section of which declares .the privileges, the act relied on by counsel here being only a supplemental act, passed the same day, fixing the rates of taxation. Act 1883, c. 105; Act 1883, c. ·106, pp. 103–135. So it appears that neither of these cases, nor any of these acts, justifies·the assumption of counsel in argument that "unless there is a restriction in the act itself, it will apply to county revenue," and this notion is the whole basis of the assessment by the county plaintiff of the taxes claimed by this bill. The argument is founded on the assertion that whenever a tax act, as this act of 1877, under review, imposes a privilege tax for the state, the counties may each and every one, and so the municipalities of lesser degree may likewise, impose a privilege tax, not exceeding the state tax, unless the act itself forbids it; because the general Code has enacted that "the polls, property, and privileges that are taxable or exempt from taxation for county purposes are the same that are taxable and exempt from taxation for state revenues." Thomp. & S. Code, § 483; Mill. .& V. Code, § 562. But this section was only a Code declaration of the subjects of taxation by counties, as the revenue laws then were, and, as the subsequent sections in the next chapter of the Code and many others show, was not in itself an authority to levy taxes on those taxable articles there enumerated.· In other words, that section of the Code was not a general authority to counties to levy taxes, but only that part of the revenue laws indicating generally what was liable to taxation. The legislature was not by that section exercising its power, under section 29 of article 2 of the constitution, to authorize the several counties and towns to impose taxes by directing that, whenever the state levied a particular tax, the county or town might also do the same, unless excluded especially by the act. It had no such purpose in view. The Code itself, which embodied the revenue statutes of that day, otherwise levied county taxes, in other places, as will be seen by following the index on the subject. I have not examined all the tax laws of Tennessee, but I have very carefully examined many of them, old and new, and do not find anywhere in the legislative habit any warrant for this assumption of counsel. I do not say that the authority of a county to levy a particular tax is always found in the very act which levies it for the state, and that it may not arise by necessary implication, as in other cases of implied legislation; but it will be found that the implication does not depend on the absence from the act of any words excluding the county, and a general law authorizing the county in all cases to tax where the state taxes, but on the fact that ·the particular act is only a part of a general system of many acts constituting revenue legis-

lation which at the foundation had an act applying the law to counties at the same time as to the state; towns and cities being generally left to their special charters, though they are sometimes mentioned.

It is undoubtedly generally true that, whenever the state levies a tax, the counties are authorized to levy a similar tax, not exceeding the state tax or that especially fixed by the act, and this is always so, I think, in a general revenue law. There is no nicely adjusted system of revenue laws, and of all subjects of legislation these are the most characterized by want of uniformity and system, and are irregular and slipshod in habit, not to say slovenly; yet it will be seen that there is a habit about it that precludes that which the county assumes in this case, which is that once in a while a general revenue statute, or a pair or several of them, will be attempted, wherein taxes are authorized for state and county purposes, the county being always specially mentioned, and all other acts are repealed. Then commences the process of patching and tinkering, often unskillfully done and creating more confusion, but the general law remains the foundation of the amendatory legislation until the confusion becomes so great that a new start is made by another general law, to be put through the same process of amendment as before. These amendatory acts do not always couple the county with the state, but sometimes do, and the authority of the county depends upon the original act, as often the state levy does; also notwithstanding the amendatory act. But this is an entirely different habit from that urged here in behalf of the county, that the Code confers a general power, and nothing excludes it but special exclusion of the county in the particular act. So far as these revenue laws are concerned, the Codes are as transitory as the other tax laws are found to be, and only embody the general foundation act in existence at the time the Code happens to be enacted. There is not an intention by a fixed Code statute to give the counties general power of taxation to operate somewhat like a constitutional power would act, and only to be withdrawn by special exclusion of the counties, but they must, like the state, take their chances in the constantly changing revenue enactments, and depend upon them for whatever authority they give when construed altogether. It might be a very useful and beneficial power for the counties to possess to be comparatively exempt from changing authority, and thus have a right to tax, absolutely, whenever the state taxes, unless forbidden; but such is not our law nor our habit of legislation as any one will see upon careful investigation, historically and critically made. This fallacy lies at the foundation of the claim set up in this bill. Neither the act of 1877, nor that of 1881, particularly authorized counties to levy a privilege tax on sleeping-cars passing through their territory, and taking up therein such travelers as might board the train in that county. The state might possibly authorize the counties to tax as a privilege, to the extent of $50 or $75, each sleeping-car so passing through a county; and under *Dun* v. *Cullen,* *supra,* this would mean a privilege tax for the state in each county of that sum as well as for that county; but it has not done this in terms, and by all the rules of law governing implications of legislative intention it will not, by con-

struction only, be held to have levied so preposterous, unjust, and oppressive a tax. Just think· of it. These cars—2 of them—run daily through 12 counties; and under· *Dun* v. *Cullen, supra,* this would be a yearly tax on each car of $1,800, which is, as I calculate it, something over 12 per cent. of its gross revenues, if it carried on every day a full complement of 20 sleeping passengers, at $2 a berth, between Nashville and Memphis; and if it should run through the whole length of the state, and touch, as it would, over twice as many counties, the tax would be more, unless the charges for accommodations should likewise be more than doubled. This kind of taxation would amount to prohibition, and especially when we know the cars often run nearly empty, and this, too, when the fares taken up in Gibson county would not possibly amount to the tax in any given year. No court will imply an intention which presents such results, unless forced to it by a necessity that knows no denial. It might be a possible implication, if the legislative habit were such as counsel claims, but, in view of the habit, we have endeavored to point out it is impossible. The original sleeping-car tax was a special and fixed tax, not found in a general revenue law, nor intended as an amendment extending the county tax to that subject of taxation. It was a loose and evidently ill-considered bit of legislation in not making the intention more manifest; but in the very nature of the case, in view of the business taxed, it probably never occurred to the draughtsman or the legislature that running a sleeping-car across a county a few minutes each day was such a doing of business in that county as would justify its taxation, as a privilege, by counties. It was so incongruous in its relation to county taxation that it did not occur to the legislature that such a construction could be claimed for it. And, really, no business is carried on in Gibson county when the car rolls through it, possibly in 60 minutes or less, and taxable county privileges are those where the business is located and done in the county. To use the illustrations of the counsel for the plaintiff, the peddler, although in one sense transitory, really is, for the time being, located in Gibson county, and sells quite exclusively to its population while there; and so the circus shows almost exclusively to them for the time being; but the sleeping-car, while it may take up a Gibson county man now and then, or sell a ticket at its stations to him, who enters the cars, can hardly be said to be doing business in that county in such a sense as would justify taxing it as a privilege by counties. while as to the whole state it might be fair and well enough to tax the privilege, as has been done by these acts. It is in the light of such considerations as these that we arrive at the legislative intention; certainly, when we are asked to imply it, in the absence of all express declaration to that end which is contrary to all sense of justice. The fact that in 1883 the counties were precluded by the tax-act itself from levying this privilege tax on sleeping-cars shows, in the view we have taken, rather that the original intention was to exclude, than to authorize, it. Dismiss the bill, at the plaintiff's cost.