NORTH SLOPE BOROUGH, Appellant,

v.

SOHIO PETROLEUM CORPORATION, Atlantic Richfield Company, Exxon Corporation, Arco Pipeline Company, Sohio Pipeline Company, Exxon Pipeline Company, Amerada Hess Corporation, Mobil Alaska Pipeline Company, Phillips Petroleum Company, Union Alaska Pipeline Company, BP Pipelines Inc., and BP Alaska Exploration Inc., Appellees.

STATE OF ALASKA, Appellant,

v.

SOHIO PETROLEUM CORPORATION, Atlantic Richfield Company, Exxon Corporation, Arco Pipeline Company, Sohio

Pipeline Company, Exxon Pipeline Company, Amerada Hess Corporation, Mobil Alaska Pipeline Company, Phillips Petroleum Company, Union Alaska Pipeline Company, BP Pipelines Inc., and BP Exploration Inc., Appellees.

SOHIO PETROLEUM CORPORATION, Atlantic Richfield Company, Exxon Corporation, Arco Pipeline Company, Sohio Pipeline Company, Exxon Pipeline Company, Amerada Hess Corporation, Mobil Alaska Pipeline Company, Phillips Petroleum Company, Union Alaska Pipeline Company, BP Pipelines Inc., and BP Alaska Exploration Inc., Cross-Appellants,

v.

STATE OF ALASKA and North Slope Borough, Cross-Appellees.

Nos. 3460, 3513 and 3659.

Supreme Court of Alaska.

Oct. 20, 1978.

Charles K. Cranston, Gallagher, Cranston & Snow, Anchorage, for appellant and cross-appellee, North Slope Borough.

Richard O. Gantz, Carl J. D. Bauman, Hughes, Thorsness, Gantz, Powell & Brundin, Theodore E. Fleischer, Paul DeStefano, Ely, Guess & Rudd, Anchorage, for appellees and cross-appellants.

Joseph K. Donohue, Asst. Atty. Gen., Avrum M. Gross, Atty. Gen., Juneau, for appellant and cross-appellee, State of Alaska.

Timothy G. Middleton, Wohlforth & Flint, Anchorage, for Alaska Municipal Bond Bank Authority, City and Borough of Juneau and Municipality of Anchorage, amici curiae.

Before BOOCHEVER, C. J., and RABINOWITZ, CONNOR, BURKE and MATTHEWS, JJ.

MATTHEWS, Justice.

This is a three-sided property tax case. At issue is whether the appellees should pay $3,785,050.18 to the North Slope Borough, to the State, or to both of them. The Superior Court held that the money should

go to the State. We reverse, and hold that it should be paid to the Borough.

An act passed by the 1973 session of the Alaska Legislature levied a tax of 20 mills on the trans-Alaska¯ pipeline and other property used in the exploration for and production and transportation of oil and gas.[1] Relevant portions of the Act are set forth in the margin.[2]

1. Ch. 1, FSSLA 1973.

2. * Section 1. AS 43 is amended by adding a new chapter to read:

CHAPTER 56. OIL AND GAS EXPLORATION, PRODUCTION AND PIPELINE TRANSPORTATION PROPERTY TAXES.

Sec. 43.56.010. LEVY OF TAX.

(a) An annual tax of 20 mills is levied each tax year beginning January 1, 1974, on the full and true value of taxable property taxable under this chapter.

(b) A municipality may levy and collect a tax under AS 29.53.045 at the rate of taxation that applies to other property taxed by the municipality. A tax collected by a municipality as authorized by AS 29.53.045 shall be credited against the tax levied under (a) of this section and shall be levied at a rate no higher than the rate applicable to other property taxable by the municipality. No municipality may exempt from taxation property authorized to be taxed under this chapter. Exemptions shall be limited to those in AS 29.53.020 and 29.53.025 and sec. 20 of this chapter.

(c) If the total value of assessed property of a municipality taxing under AS 29.53.-045(c) exceeds the product of 225 per cent of the average per capita assessed full and true value of property in the state (to be determined by the department and reported to each municipality by January 15 of each year) multiplied by the number of residents of the taxing municipality, the department shall designate the portion of the tax base against which the local tax may be applied.

Sec. 43.56.030. IN PLACE OF OTHER TAXES. Except for those taxes imposed under ch. 55 and ch. 57 of this title, the taxes levied or authorized under sec. 10(b) of this chapter are in place of

(1) all other ad valorem taxes or other taxes imposed by a municipality on property subject to tax under this chapter or exempted from taxation by sec. 20 of this chapter, and

(2) all other taxes imposed by a municipality on or with respect to the property subject to tax under this chapter or exempted from taxation by sec. 20 of this chapter, including, but not limited to,

(A) taxes on the retail sale or use of the property except for the retail sales tax on the first $1,000 of each sale;

(B) taxes on the sale or use of gas or unrefined oil;

(C) taxes on the sale or use of services used in or associated with the property or in its erection, construction, maintenance or operation except for the sales tax on the first $1,000 of each sale;

(D) taxes on or measured by gross or net income from the property, including income from the exploration for, production of, or pipeline transportation of gas or unrefined oil or property; and

(E) any license, excise, fee, charge or other tax on or pertaining to the property or services.

. . . . .

* Sec. 3. AS 29.53 is amended by adding a new section to read:

Sec. 29.53.045. TAX ON OIL AND GAS PRODUCTION AND PIPELINE PROPERTY.

(a) A municipality may levy and collect taxes on taxable property taxable under AS 43.56 only by using one of the methods set out in (b) or (c) of this section.

(b) A municipality may levy and collect a tax on the full and true value of taxable property taxable under AS 43.56 as valued by the Department of Revenue at a rate not to exceed that which produces an amount of revenue from the total municipal property tax equivalent to $1,000 a year for each person residing within its boundaries. [Changed to $1,500 in 1976 by § 8, Ch. 107, SLA 1976.]

(c) A municipality may levy and collect a tax on the full and true value of that portion of taxable property taxable under AS 43.56 as assessed by the Department of Revenue which, when combined with the value of property otherwise taxable by the municipality, does not exceed the product of 225 per cent of the average per capita assessed full and true value of property in the state multiplied by the number of residents of the taxing municipality.

. . . . .

* Sec. 4. AS 29.53.050 is amended by adding a new subsection to read:

(b) No municipality, or combination of municipalities occupying the same geographical area, in whole or in part, may levy taxes which will result in tax revenues from all sources exceeding either (1) $1,000 a year for each person residing within their boundaries or (2) when combined with the value of property otherwise taxable by the municipality, the product of 225 per cent of the average per capita assessed full and true value of property in the state multiplied by the number of residents of the taxing municipality. If two or more municipalities occupying the same geographical area, in whole or in part, attempt to levy a tax the combined levy of

In 1976, the North Slope Borough levied a property tax of 7.68 mills for operating expenses and 2.62 mills for debt service, payment of principal and interest on general obligation bonds. The portion of the levy for debt service exceeded the maximum per capita revenue limitation expressed in Section 3 of the Act, AS 29.53.045(b), as amended in 1976, which was an amount equal to $1,500 for each resident of the Borough.

After the Borough levied the tax, the Alaska Department of Revenue adopted an emergency regulation [3] which provides that the State will not grant a tax credit for taxes paid to a municipality in excess of the revenue limitations of AS 29.53.045. Within two weeks after the regulation became effective, the Borough brought suit against the State seeking a declaratory judgment that the regulation was illegal and an injunction barring its enforcement. The Borough added a claim against Atlantic Richfield Co. (ARCO), a major owner of taxable property under the Act (AS 43.56 property), seeking a declaration of the legality of the debt service levy. ARCO answered, asking for a dismissal of the Borough's complaint,

and filed a cross-claim against the State seeking a declaration that the emergency regulation was invalid.

Meanwhile, a separate suit for interpleader was filed by SOHIO Petroleum Corporation, ARCO, Exxon Corporation, ARCO Pipeline Company, SOHIO Pipeline Company, Exxon Pipeline Company, Amerada Hess Corporation, Mobil Alaska Pipeline Company, Phillips Petroleum Company, Union Alaska Pipeline Company, BP Pipelines Inc., and BP Alaska Exploration Inc. (hereafter referred to as the taxpayers) all of which own various amounts of AS 43.56 property. The taxpayers alleged that their AS 43.56 property could not be taxed for more than 20 mills by the Borough and State combined.[4] They sought an order enjoining the Borough and State from recovering any taxes in excess of 20 mills and an adjudication as to which party should receive the 2.62 mill levy the Borough had imposed for debt service and for which the State, by the emergency regulation, had refused to grant a tax credit. In response to the taxpayers' interpleader complaint, both the Borough and State demanded payment of the 2.62 mill levy. Subsequently,

---

which would result in tax revenues from all sources exceeding either (1) $1,000 a year for each person residing within their boundaries or (2) when combined with the value of property otherwise taxable by the municipality, the product of 225 per cent of the average per capita assessed full and true value of property in the state multiplied by the number of residents of the taxing municipality, the commissioner of community and regional affairs shall apportion the lawful levy and equitably divide these revenues on the basis of need, services performed and other considerations in the public interest. For the purpose of this subsection, population shall be determined by the commissioner of community and regional affairs based on the latest statistics of the United States Bureau of the Census or on other reliable population data.
* Sec. 5. AS 29.53.055 is amended to read:
 Sec. 29.53.055. NO LIMITATION ON TAXES TO PAY BONDS. The limitations provided for in secs. 45 or 50 of this chapter do not apply to taxes levied or pledged to pay or secure the payment of the principal and interest on bonds. Taxes to pay or secure the payment of principal and interest on bonds may be levied without limitation as to rate or amount.

3. The regulation, 15 AAC 05.840(a), became effective June 2, 1976 and provides in relevant part:

 The excess of any current property taxes that is collected by one or more municipalities pursuant to AS 29.53.055 beyond the limitations set forth in AS 29.53.045 and 29.53.-050(b) will not be allowed as a credit against, or refund of, the tax levied by the state under AS 43.56.010(a).

 Credit was given for property taxes paid to municipalities under AS 43.56.010(a) before June 30, 1975.

4. Upon filing the interpleader action, taxpayers paid 9.7 mills ($14,013,353.71) to the State which constituted the 20 mill state tax, less credit for the 10.3 mills levied by the Borough. After a minor population dispute, taxpayers paid 7.68 mills ($11,095,108.92) to the Borough which was the maximum rate permissible under the revenue limitation expressed in AS 29.-53.045 and represented the Borough's general operating and expense levy. Taxpayers deposited into court 2.62 mills ($3,785,050.18) which represented the alleged maximum of 20 mills less the 9.7 mills paid the State and the 7.68 mills paid the Borough.

the Borough withdrew its challenge to the State's emergency regulation in the first lawsuit. The remaining claims in that case, *Borough v. ARCO* and *ARCO v. State*, were consolidated with the interpleader action.

All parties moved for summary judgment. The superior court published a memorandum decision on April 29, 1977, holding that the Borough's 2.62 mill debt service levy was unlawful. The court's rationale was that the legislature, in passing Sec. 5 of the Act, which amended AS 29.53.055, intended to give municipalities the power to levy taxes for bonded indebtedness in excess of the limitations imposed in AS 29.53.045 and .050 only in cases of default or where default was threatened.

In response to the court's decision, the legislature enacted sections 6 and 7 of chapter 94, SLA 1977. Section 6 amended AS 29.53.055 to overrule the court's interpretation:

> *No limitation on taxes to pay bonds.* The limitations provided for in Sec. 45 or 50 of this chapter do not apply to taxes levied or pledged to pay or secure the payment of the principal and interest on bonds. Taxes to pay or secure the payment of principal and interest on bonds may be levied without limitation as to rate or amount, *regardless of whether the bonds are in default or in danger of default.* (New language emphasized.)

Sec. 7 amended AS 29.58.180(a) to read:

> *Payment.* (a) The full faith and credit of a municipality are pledged for the payment of principal and interest on general obligation bonds. The municipality may levy ad valorem taxes for payment without limitation of rate or amount to pay or secure the payment of the principal and interest on bonds, *regardless of whether the bonds are in default or in danger of default.* (New language emphasized.)

Sections 6 and 7 were made retroactive to January 1, 1976, and the entire Act, approved by the governor on June 4, 1977, was to be effective immediately.

**5.** Prior to its amendment in 1977, AS 29.58.180(a) provided:

The superior court entered a final judgment in accordance with its April 29 decision on May 27, and on June 3, the Borough filed a notice of appeal to this court. On June 9, we entered an order remanding the case for reconsideration in view of ch. 94, SLA 1977, and for a determination of other outstanding issues. In compliance with our order, the superior court entered a decision on August 22, 1977 reaffirming its May 27 judgment. Among the holdings of that decision were:

(1) Ch. 94 SLA 1977 is invalid in its entirety because it is not confined to a single subject as required by Art. II, § 13 of the Alaska Constitution.

(2) The retroactivity clause is invalid both as a local or special act in contravention of Art. II, § 19 of the Alaska Constitution and for failure to comply with the constitutional enactment requirements of Art. II, § 18 and AS 01.10.070(f)(3).

(3) Even assuming general validity of § 8, Ch. 94, SLA 1977, the Borough's 1976 levy was procedurally defective.

(4) The emergency regulation, 15 AAC 05.840, is invalid and thus a taxpayer would be entitled to a credit from the State for taxes paid to a municipality in excess of the AS 29.53.045 limitations.

(5) The May 27 final judgment would not be amended.

The Borough and State appeal from this decision.

**II**

The first question presented is whether the 2.62 mill debt service levy was valid. The Borough and State contend that the plain language of AS 29.53.055 and AS 29.58.180(a) authorizes taxes to pay for municipal bonds, independent of the limitations of AS 29.53.045 or AS 29.53.050, and regardless of whether the bonds are in default or default is pending. The taxpayers contend that AS 29.53.055 and AS 29.58.180(a)[5] con-

The full faith and credit of a municipality are pledged for the payment of principal and

tain an implied condition that municipalities may exceed the limitations of AS 29.53.045 and .050 only in bonding emergencies. They base this argument primarily on the legislative history of AS 29.53.055.

After its amendment by the 1973 Act, but before the 1977 amendment, AS 29.53.055 read as follows:

*No limitation on taxes to pay bonds.* The limitations provided for in secs. 45 or 50 of this chapter do not apply to taxes levied or pledged to pay or secure the payment of the principal and interest on bonds. Taxes to pay or secure the payment of principal and interest on bonds may be levied without limitation as to rate or amount.

If we properly comprehend the taxpayers' position, language similar to that which we have placed in brackets should be read into the statute:

*No limitation on taxes to pay bonds.* The limitations provided for in secs. 45 or 50 of this chapter do not apply to taxes levied or pledged to pay or secure the payment of the principal and interest on bonds [in default or pending default]. Taxes to pay or secure the payment of principal and interest on bonds [in default or pending default] may be levied without limitation as to rate or amount.

We note at the outset that a literal reading of the language of the Act favors the interpretation given by the Borough and State. The limiting language which the taxpayers suggest must be read into AS 29.53.055 is absent. We do not, however, end our inquiry with this literal approach. While a fundamental principle of statutory interpretation is that a statute means what its language reasonably conveys to others,[6] reference to legislative history may provide an insight which is helpful to making a judgment concerning what a statute means.[7]

AS 29.53.055 was passed on April 8, 1960, as Chapter 94, SLA 1960, and provided:

No incorporated town or municipality shall levy any tax for any purpose in excess of 3 per centum of the assessed valuation of property within the town in any one year; but the limitation provided for herein shall not be applicable to taxes levied or pledged to pay or secure the payment of the principal of and interest on any bonds of such incorporated town or municipality, which taxes may be levied without limitation as to rate and amount.

interest on general obligation bonds. The municipality may levy ad valorem taxes for payment without limitation of rate or amount.

**6.** *See Deputy v. du Pont*, 308 U.S. 488, 493, 60 S.Ct. 363, 84 L.Ed. 416 (1940); *Mercantile Bank & Trust Company v. United States*, 441 F.2d 364, 366 (8th Cir. 1971); 2A J. Sutherland, *Statutes and Statutory Construction* § 45.07 at 20–21 (4th ed. Sands 1974); Holmes, *Collected Legal Papers* at 207 (New York 1920). *Cf. Day v. A & G Construction Co., Inc.*, 528 P.2d 440, 445 (Alaska 1974) (contract terms to be interpreted in " 'the sense in which the party using the word should reasonably have apprehended that they would be understood by the other party', and the meaning which the recipient of the communication might reasonably have given to it.")

**7.** *See* 2A J. Sutherland, *supra* § 45.09 at 29–30. We reject the so-called "plain meaning" rule as a strict exclusionary rule. That rule states that where language of a statute is clear and construction according to its terms does not lead

to absurd consequences, the words used are taken as the final expression of the meaning intended and legislative history will not be consulted. *See United States v. Shreveport Grain & Elevator Co.*, 287 U.S. 77, 83, 53 S.Ct. 42, 77 L.Ed. 175 (1932); *United States v. Missouri Pac. Ry.*, 278 U.S. 269, 278, 49 S.Ct. 133, 73 L.Ed. 322 (1929); *Caminetti v. United States*, 242 U.S. 470, 37 S.Ct. 192, 61 L.Ed. 442 (1917). In practice, however it appears that this rule is often ignored. *Lynch v. Overholser* 369 U.S. 705, 82 S.Ct. 1063, 8 L.Ed.2d 211 (1965); *Harrison v. Northern Trust Co.*, 317 U.S. 476, 63 S.Ct. 361, 87 L.Ed. 407 (1943); *United States v. Dickerson*, 310 U.S. 554, 60 S.Ct. 1034, 84 L.Ed. 1356 (1940). The issue is analogous in many respects to that encountered in cases determining the meaning of a contract where we no longer require a preliminary finding of ambiguity before consulting relevant extrinsic sources. *Stordahl v. Government Employees Insurance Co.*, 564 P.2d 63, 66 (Alaska 1977); *Wessells v. State*, 562 P.2d 1042 (Alaska 1977); *Tsakres v. Owens*, 561 P.2d 1218 (Alaska 1977).

Chapter 94, SLA 1960, had been passed by the Senate in the form which eventually became law. It was then sent to the House where it was initially rejected. In its place, the House passed an amended version of the Senate bill which read in part as follows:

> [T]he limitation provided for herein shall not be applicable to taxes levied *pursuant to court judgment after a default* to pay or secure the payment of the principal of and interest on any bonds of such incorporated town or municipality, which taxes may be levied without limitation as to rate and amount. (Emphasis added.)

When presented with the House amendment to its bill (SB 196), the Senate unanimously refused to concur and voted to send a request to the House that it recede from its proposed amendment. The House did recede and agreed to the Senate bill. This history is relevant because it shows that when one house of the legislature initially wished to limit the power to exceed the three per cent maximum tax for debt service purposes, it did so expressly. The House's subsequent recession from that limitation, taken together with the Senate's refusal to concur in the amendment, is persuasive evidence that no implied limitation was intended.

The next relevant event in the history of AS 29.53.055 took place with the 1972 recodification of laws relating to municipalities. The unconditional language of Chapter 94, SLA 1960, was then codified as AS 29.53.-055:[8]

> *No Limitation on Taxes to Pay Bonds.* The limitation provided for in sec. 50 of this chapter does not apply to taxes levied or pledged to pay or secure the payment of the principal and interest on bonds. Taxes to pay or secure the payment of principal and interest on bonds may be levied without limitation as to rate or amount.

The legislature also enacted, as part of the 1972 municipal law revision, AS 29.53.410 which allowed second class cities to exceed established taxing limits for debt service, only where necessary to avoid a default. In relevant part, Section 410 provided:

> However, levy by a second class city may not exceed one-half of one per cent of the assessed valuation of the property taxed, except that the limit does not apply to a levy necessary to avoid a default upon payment of principal and interest of bonded or other indebtedness which is secured by a pledge to levy ad valorem or other taxes without limit to meet debt payments.

The contrasting methods used to waive tax limitations were discussed in a committee report.

> The code continues provisions of present law imposing a municipal tax limitation on all municipalities of three per cent of the assessed valuation of property within the municipality and excepting taxes for the payment of bond obligations from the limitation (Sec. 29.53.050 and 29.53.055). (As noted above, a more restrictive limitation is imposed as to the newly conferred power of second class cities to levy a property tax upon referendum approval, i. e. a limitation of one-half of one per cent of the assessed valuation of the property taxed. That limit may be exceeded in a second class city which has authorized a property tax by referendum, but only if levy of the tax is necessary to avoid a default in payment of bond or other debt obligations (Sec. 29.53.410) . . . .[9]

The 1972 history serves to reaffirm that the legislature intended no implied limitation as a part of AS 29.53.055. Had it wished to impose such a limitation it would have done so expressly, as it did in Section 410.

We come next to the 1973 special session and the enactment of the property tax on oil and gas related property referred to at

---

**8.** The three per cent taxing limitation of Ch. 94, SLA 1960, was placed in AS 29.53.050.

**9.** Supplemental Report to Free Conference Committee Report on SCS CSHB 208 am S and CSHB 208 am (Revised Municipal Code), dated June 16, 1972. 1972 House Journal at 1726–27.

the outset in this opinion. Section 3 of that act added AS 29.53.045 which set out the per capita limitation on taxes previously described. Section 4 of the act added the per capita limitation as part (b) of AS 29.-53.050, the section which already contained a three per cent municipal taxation limitation. Section 5 of the act amended AS 29.53.055 only by adding reference to the new section 45 and pluralizing certain words.

The bill which became the 1973 Act is designated as the Free Conference Committee Substitute for the Senate Committee Substitute for the Committee Substitute for House Bill No. 1. The senate committee report of November 2, 1973, on the senate committee substitute for the bill was accompanied by a sectional analysis by the Legislative Counsel. That analysis specifically refers to the new per capita limit. It states, in relevant part:

> However, it is *important* to note that the limit does *not* apply to taxes levied or pledged to pay or secure the payment of the principal or interest on bonds. See AS 29.53.055 and 29.58.180. Taxes for that purpose may be levied without regard to any limit imposed by this new subsection.

1973 FSS Senate Journal at 70.

On November 11, 1973, the free conference committee reported on the bill as it was finally passed. Section 13 of that report states as follows:

> Sec. 5: Language was added to AS 29.53.055 to make clear that the limitations on municipal taxing authority with respect to oil and gas properties taxable under this chapter do not apply to taxes levied or pledged to pay or secure the payment of principal and interest on bonds.

After the adoption of that report was moved but not voted on, the Senate stood in recess. Upon reconvening the same day, the following letter, signed by all six members of the free conference committee, was read:

You have directed the attention of the members of the Free Conference Committee that considered Free Conference Committee Substitute for Senate Committee Substitute for Committee Substitute for House Bill No. 1 (ad valorem tax on oil and gas exploration, production and pipeline transportation property) to Section 5 of the bill.

Section 5 of the bill amends AS 29.53.-055 to provide that the limitations on municipal taxation proposed in Section 45 as well as those existing limitations in Section 50 of AS 29.53 do not apply to taxes levied or pledged to pay or secure the payment of the principal and interest on bonded indebtedness.

The language of Section 55 originally was adopted to avoid general obligation bonds being denominated as limited tax bonds which would result in higher interest costs. It is the intent of the Committee that Section 5 of the bill is not intended to expand local governments' right to tax facilities covered by this act but *only to give local governments the right in case of default or pending default on bonds to exceed the limits in Sec. 45 and 50 of AS 29.53.* (Emphasis added.)

The Senate then adopted the free conference committee report, as supplemented, which under existing senate rules passed the bill.[10]

In the House, also on November 11, 1973, the free conference committee report was adopted and the bill was passed before the supplemental letter was appended to the report. After the House had adopted the bill, the speaker stated, without objection, that the reading of the supplemental letter would be waived and it would appear in the House Journal.

 The legislative history of AS 29.-53.055 is therefore in conflict. The 1960 and 1972 history clearly indicates that section 55 was meant to contain no default or pending default limitation. Likewise, the structurally minor amendment to that section in 1973, as it passed through the legis-

10. 1973 FSS Senate Journal at 126–128.

lative processes of the special session, was accompanied by an analysis reflecting this understanding. The supplemental free conference committee report indicated a contrary intent. However, that report did not purport to amend the language of section 55 in any way.[11]

 Since the 1973 committee reports are in conflict, they can hardly be regarded as valuable aids in determining meaning.[12] The 1970 and 1972 legislative history, however, is consistent with and distinctly supportive of a literal interpretation of section 55. We adopt such an interpretation.

 The trial court concluded that the taxing limitations of AS 29.53.045 and .050 would serve no useful function if AS 29.53.-055 did not contain an implied limitation under which property tax limits could be exceeded only where a bond default was threatened. Relying on the rule of statutory construction that a statute should be construed so that each section has meaning,[13] the court reasoned that section 55

must contain an implied limitation. However, section 55, literally read, does not render sections 45 and 50 meaningless. Section 55 applies only to debt financing.[14] The limitations of sections 45 and 50 apply to operating revenues. Merely because they do not also curb taxes to pay for bonds does not render them nullities.

### III

 The next issue is whether the emergency regulation, 15 AAC 05.840,[15] is valid. This regulation denies a credit for property taxes collected by municipalities in excess of the limitations set forth in AS 29.53.045 and 29.53.050(b). In questions of this nature, we will review the regulation first to ensure that it is "consistent with and reasonably necessary to carry out the purposes of the statutory provisions conferring rulemaking authority on the agency," and second to ascertain whether the regulation is "reasonable and not arbitrary." *Jager v. State*, 537 P.2d 1100, 1107 n. 23 (Alaska 1975); *Kingery v. Chapple*, 504 P.2d 831,

---

**11.** Our constitution imposes certain requirements of formality on legislative action. Article II, § 14 provides that no bill may become law until it has passed three readings in each house on three separate days, no bill may become law without an affirmative vote of a majority of the membership of each house, and the yeas and nays on final passage shall be entered in the journal. One purpose of these requirements is to ensure that the legislature knows what it is passing. Any passed bill is subject to veto by the governor. Article II, § 15 Alaska Constitution. Only bills are approved or vetoed, not the contents of the house and senate journals, or the tape recordings of committee and floor debates. The legislature enacts laws by the passage of bills meeting the foregoing formalities. It may not enact a law or change one by committee report. Such a report may be useful in interpreting an enacted statute, but it is not itself the statute.

**12.** The difficulty in drawing reliable conclusions from legislative history has often been noted as one reason why legislative history should be used with caution. Donahue, *Limitations on Judicial Review: A Semiotic Interpretation of Statutes*, 7 UCLA, Alaska L.Rev. 204 (1978); Frankfurter, *Some Reflections on the Reading of Statutes*, 47 Colum.L.Rev. 527 (1947); Jones, *Statutory Doubts and Legislative Intention*, 40 Colum.L.Rev. 957 (1940); Jackson, *The Meaning of Statutes: What Congress Says or What the Court Says*, 34 A.B.A.J.

535 (1948); Horack, *Cooperative Action for Improved Statutory Interpretation*, 3 Vand.L. Rev. 382 (1950); MacCallum, *Legislative Intent*, 75 Yale L.J. 754 (1966); Nunez, *The Nature of Legislative Intent and the Use of Legislative Documents as Extrinsic Aids to Statutory Interpretation: A Re-Examination*, 9 Cal.W. L.Rev. 128 (1972). One writer has observed:

Bills are approved by legislators who don't have time to read them much less evaluate their merits. In the end, when tempers are short and sessions are long, it's easy for multi-million dollar mistakes to be made just because nobody can keep up with all the changes in all the bills.

· · · · ·

Whoever came up with the line, "Two things you should never watch being made are laws and sausage," sure knew what he was talking about.

Nussbaum, *Enduring Deals*, Anchorage Daily News, June 19, 1978, at 2, Col. 1–2.

**13.** *See Isakson v. Rickey*, 550 P.2d 359, 364 (Alaska 1976).

**14.** A municipality is free to incur bonded indebtedness only for capital improvements, and only with voter approval. Alaska Constitution, Article IX, § 9.

**15.** See footnote 3.

835 (Alaska 1972); *Kelly v. Zamarello*, 486 P.2d 906, 911 (Alaska 1971). The superior court held the emergency regulation to be invalid because it conflicts with the act which it purports to interpret. We agree. .

Subsection (d) of AS 43.56.010 provides that "[a] tax paid to a municipality under AS 29.53.045 . . . shall be credited against" the 20 mill tax levied by the State under subsection (a). The question is whether taxes collected on AS 43.56 property which exceed the limitations expressed in AS 29.53.045 and 29.53.050(b) are nevertheless taxes "paid to a municipality under AS 29.53.045." If they are, then a tax credit is mandatory.

AS 43.56.030 provides that AS 43.56 property can be taxed by a municipality only under a levy authorized by AS 43.56.010(b). That subsection, in turn, authorizes the taxation of such property only under AS 29.53.-045. Thus if AS 43.56.030 is to be interpreted as meaning what it says, municipal taxation of AS 43.56 property may only occur as authorized under AS 29.53.045 and all of it is entitled to a state tax credit.

The first sentence of AS 29.53.055 acts to suspend the limitations imposed by AS 29.-53.045 but not the language which authorizes taxation of AS 43.56 property. The second sentence of AS 29.53.055 does contain independent authorizing language, "[t]axes . . . may be levied," but may not be construed as a grant to tax AS 43.56 property independent of the authority of AS 29.53.045(a) (as distinct from its limitations) because AS 43.56.030 and AS 43.56.-010(b) provide that municipalities may tax AS 43.56 property only under AS 29.53.045. Since AS 43.56.010(d) mandates that all tax-

es paid under AS 29.53.045 are to be credited against the 20 mill state tax levy of AS 43.56.010(a), the emergency regulation which denies the tax credit is invalid.[16]

The state argues that the emergency regulation must be sustained because to do otherwise is to open the possibility of "total erosion of the State tax base and complete diversion of revenue from a state resource to a single privileged borough." That result is theoretically possible under our interpretation. If the North Slope Borough levy for debt service was 12.42 mills rather than 2.62 mills, the state would receive no revenue from AS 43.56 property in the Borough. However, that theoretical possibility does not render our interpretation invalid because the legislature itself expressly adverted to the same possibility. The last sentence of AS 43.56.010(d) provides:

> The credit or refund of taxes paid to a municipality may not exceed the total amount of tax levied by the department upon the taxpayer for the tax year, under (a) of this section.

Therefore, the legislature contemplated the possibility that a municipality might collect a tax of more than 20 mills on AS 43.56 property; if so, the taxpayer would receive a credit of 20 mills against state taxes, leaving the state with nothing.

### IV

We now turn to Chapter 94, SLA 1977. We must determine whether that statute violates Article II, Section 13 of the Alaska Constitution [17] which requires every bill to be confined to one subject.[18]

Chapter 94, SLA 1977, is entitled "An Act Relating to Taxation; And Providing for an

16. In the process of reaching this conclusion we have examined the various items of legislative history presented by the parties. The materials do not address the specific question presented and are not helpful.

17. Alaska Constitution, Article II, § 13 provides:

> *Form of Bills.* Every bill shall be confined to one subject unless it is an appropriation bill or one codifying, revising, or rearranging

existing laws. Bills for appropriations shall be confined to appropriations. The subject of each bill shall be expressed in the title. The enacting clause shall be: "Be it enacted by the Legislature of the State of Alaska."

18. Since Chapter 94, SLA 1977, made explicit the interpretation we have given to AS 29.53.-055 and AS 29.58.180(a) in part II of this opinion, questions concerning its effective date and retroactivity are moot.

Effective Date." It has eight sections.[19] Sections one, three and four pertain to tax credits against the Alaska net income tax under AS 43.20 for residential fuel expenses and the cost of residential improvements which result in fuel conservation. Section five amends the state excise tax on cigarettes, AS 43.50.090, excluding from taxation cigarettes sold through United States military outlets. Sections six and seven amend AS 29.53.055 and AS 29.58.180 as discussed in part II of this opinion. Section eight makes sections six and seven retroactive to January 1, 1976 and section nine provides for an effective date.

 The superior court held that because matters of both state taxation and local taxation were dealt with by the act the one subject rule expressed in our Constitution was violated. The court stated:

I do not wish to imply that the Legislature cannot validly provide for or deal with a number of different taxes in the same act, but I do find that a bill's validity is not insured merely because all of the provisions of an act relate to taxation and the act is so labeled. The fatal flaw is ch. 94 SLA 1977 in that it attempts to combine sections relating to taxation by municipal corporations under Title 29 . . . . Had the act limited itself to various state tax matters under Title 43, or limited itself to various municipal corporation tax matters under Title 29, no violation of the single subject rule would have resulted.

In determining whether a bill is confined to one subject,

[a]ll that is necessary is that the act should embrace some one general subject; and by this is meant, merely, that all matters treated should fall under some one general idea, be so connected with or related to each other, either logically or in popular understanding, as to be parts of, or germane to, one general subject.

Gellert v. State, 522 P.2d 1120, 1123 (Alaska 1974) quoting·Johnson v. Harrison, 47 Minn. 575, 50 N.W. 923, 924 (1891). Further, what constitutes one subject for the purposes of Article II, Section 13, is to be broadly construed. Gellert v. State, supra. No act will be set aside for failing to comply with this provision except where the violation is both substantial and plain. Suber v. Alaska State Bond Committee, 414 P.2d 546, 557 (Alaska 1966).

 Using these standards, we find no violation of the one subject requirement here. Municipal taxation and state taxation are often inextricably intertwined. This case is vivid testament to that fact. The act around which the central issues in this case revolve, chapter 1, FSSLA 1973, imposed a state property tax which required several amendments to municipal taxation statutes. The interpretation which we place on AS 29.53.055 and AS 29.58.180(a), before they were amended by chapter 94, SLA 1977, is the same interpretation placed on those acts by the legislature in the 1977 enactment. The net result of that interpretation has a direct impact on state tax revenues.

 State taxation is not an unduly broad category under the one subject rule. Just as taxation has been held to be the single subject of a statute imposing different kinds of taxes upon different things,[20] it is also the subject of a statute granting various tax credits and exemptions and clarifying the circumstances under which taxes may be levied. As the Supreme Court of Alabama has stated:

We are willing to adopt the definite position that further provision for or an amendment of the state's revenue in its various aspects, whether to provide for it or to regulate matters pertaining to it, or to amend it generally, is one subject and may be so expressed in the title of an act.

Sales System v. Spaeth, 209 Minn. 504, 297 N.W. 9, 13 (1941); City of Beaumont v. Gulf States Utilities Co., 163 S.W.2d 426, 430–431 (Tex.Civ.App.1942).

---

19. Although the statute's sections are numbered through nine, there is no section two.

20. Gibson County v. Pullman South. Car. Co., 42 F. 572 (W.D.Tenn.1890); C. Thomas Stores

*Harris v. State,* 228 Ala. 100, 151 So. 858, 861 (1934). In this case, since all of the provisions of the act relate directly to state taxation we find no violation of the one subject rule.

## V

The next question is whether the taxpayers are liable to the Borough and the State for penalty and interest on the money deposited in court when the interpleader action was brought. The money was deposited prior to the time the taxpayers would have been in default. Based on its inherent equitable power, the superior court refused to require taxpayers to pay a late payment penalty or interest.

We agree that the superior court was justified in not requiring the taxpayers to pay a late payment penalty. The purposes of penalty provisions for late payment of taxes are to encourage the timely payment of taxes and to punish those who do not pay on time. Those purposes are not contravened here. Taxpayers were confronted with a situation where two government entities were competing for the same tax dollars. Before taxes were in default to either entity, and in an understandable desire to avoid paying double taxes, taxpayers utilized an interpleader action under Civil Rule 22 and made their payment into the registry of the clerk of court. In similar situations courts have been held to have inherent power to waive statutory penalties. *General Petroleum Corporation v. Smith,* 62 Ariz. 239, 157 P.2d 356, 360 (1945); *Swartz v. Atkins,* 204 Tenn. 23, 315 S.W.2d 393, 394 (1958); *see Meyers v. Arcadia Realty Foundation, Inc.,* 367 S.W.2d 836, 838 (Ky.App.1963).

We do not agree, however, with the superior court's conclusion that interest should be waived. The assessment of interest for late payment has no punitive element. While it is logical to relieve a taxpayer of paying a penalty, where under circumstances such as this he has been guilty of no misconduct, interest stands on a different footing. It is non-perjorative. When a taxpayer overpays his taxes, the state is responsible not only to refund the overpayment, it also refunds the overpayment with 8% interest. AS 43.05.280. Similarly, if a taxpayer for any reason underpays his taxes, interest will also be due. Any perceived injustice in this rule can be mitigated by placing interpleaded funds in an interest bearing account, as was done here, or in interest bearing securities.

## VI

The State and the Borough also appeal an award of costs and attorneys' fees against them. Since we have reversed the judgment on which the award was based, all matters concerning costs and attorneys' fees must be redetermined by the trial court.

AFFIRMED IN PART; REVERSED IN PART; AND REMANDED.