*Notice: This opinion is subject to correction before publication in the PACIFIC REPORTER. Readers are requested to bring errors to the attention of the Clerk of the Appellate Courts, 303 K Street, Anchorage, Alaska 99501, phone (907) 264-0608, fax (907) 264-0878, email corrections@akcourts.us.*

THE SUPREME COURT OF THE STATE OF ALASKA

| | |
|---|---|
| KEVIN MEYER, LIEUTENANT GOVERNOR OF THE STATE OF ALASKA and STATE OF ALASKA, DIVISION OF ELECTIONS, | ) ) ) ) ) Supreme Court No. S-17629 |
| Appellants, | ) Superior Court No. 3AN-19-09704 CI ) ) O P I N I O N ) |
| v. | ) No. 7460 – June 12, 2020 ) |
| ALASKANS FOR BETTER ELECTIONS, | ) ) ) |
| Appellee. | ) ) |

Appeal from the Superior Court of the State of Alaska, Third Judicial District, Anchorage, Yvonne Lamoureux, Judge.

Appearances: Margaret Paton Walsh and Laura Fox, Assistant Attorneys General, Anchorage, and Kevin G. Clarkson, Attorney General, Juneau, for Appellants. Scott M. Kendall, Jahna M. Lindemuth, and Samuel G. Gottstein, Holmes Weddle & Barcott, P.C., Anchorage, for Appellee.

Before: Bolger, Chief Justice, Winfree, Stowers, Maassen, and Carney, Justices.

WINFREE, Justice.

## I. INTRODUCTION

The Alaska Constitution provides that all political power is inherent in

Alaska's people and "founded upon their will only."[1]  The people may exercise this political power in a number of ways.  The people have the constitutional right to vote in any state or local election,[2] and "it is basic to our democratic society that the people be afforded the opportunity of expressing their will on the multitudinous issues which confront them."[3]  As a corresponding check to the constitutional right to elect officials, and a check on those elected officials' conduct, the people have the constitutional right to petition to recall elected officials.[4]  And, as a check on legislative action or inaction, the people have the constitutional rights to reject legislative acts by referendum and to legislate directly by initiative.[5]  This appeal arises from the State's action limiting the people's constitutional right to legislate directly by initiative.[6]

---

[1]     Alaska Const. art. I, § 2 ("All political power is inherent in the people.  All government originates with the people, is founded upon their will only, and is instituted solely for the good of the people as a whole.").

[2]     Alaska Const. art. V, § 1 ("Every citizen of the United States who is at least eighteen years of age, who meets registration residency requirements which may be prescribed by law, and who is qualified to vote under this article, may vote in any state or local election.").

[3]     *Boucher v. Bomhoff*, 495 P.2d 77, 78 (Alaska 1972).

[4]     Alaska Const. art. XI, § 8 ("All elected public officials in the State . . . are subject to recall by the voters . . . .").

[5]     Alaska Const. art. XI, § 1 ("The people may propose and enact laws by the initiative, and approve or reject acts of the legislature by the referendum."); *see also* AS 15.45.010-.245 (restating constitutional initiative powers and providing procedures for law-making by initiative).

[6]     We note "that, of the three branches of our state government, we are entrusted with the 'constitutionally mandated duty to ensure compliance with the provisions of the Alaska Constitution,' " a duty that "sometimes requires us to answer constitutional questions surrounded by political disagreement." *Wielechowski v. State*,

(continued...)

A proposed initiative instituting three substantive changes to Alaska's election laws was submitted to the lieutenant governor for review, certification, and printing signature booklets.[7] Determining the initiative violated a constitutional requirement that proposed initiative bills be confined to one subject,[8] the lieutenant governor denied certification.[9] The initiative's sponsors filed a superior court action challenging that decision.[10] The superior court concluded, contrary to the lieutenant

---

[6] (...continued) 403 P.3d 1141, 1142-43 (Alaska 2017) (quoting *Malone v. Meekins*, 650 P.2d 351, 356 (Alaska 1982)).

[7] *See* Alaska Const. art. XI, § 2 ("An initiative or referendum is proposed by an application containing the bill to be initiated or the act to be referred. The application shall be signed by not less than one hundred qualified voters as sponsors, and shall be filed with the lieutenant governor. If he finds it in proper form he shall so certify. Denial of certification shall be subject to judicial review."), § 3 ("After certification of the application, a petition containing a summary of the subject matter shall be prepared by the lieutenant governor for circulation by the sponsors."); *see also* AS 15.45.030 (setting out form of initiative application); AS 15.45.040 (setting out required form of proposed initiative bill, including that it "shall be confined to one subject"); AS 15.45.070 (providing lieutenant governor shall review initiative and certify or notify initiative committee of denial grounds); AS 15.45.080 (setting out bases for denying certification, including if initiative bill is "not confined to one subject").

[8] *See* Alaska Const. art. II, § 13 ("Every bill shall be confined to one subject unless it is an appropriation bill or one codifying, revising, or rearranging existing laws."); AS 15.45.040 (providing for form of proposed initiative bill, including that it "shall be confined to one subject").

[9] *See* Alaska Const. art. XI, § 2 (providing for certification of initiative application if lieutenant governor "finds it in proper form"); AS 15.45.070 (providing lieutenant governor shall review initiative and certify or notify initiative committee of denial grounds).

[10] *See* Alaska Const. art. XI, § 2 (providing that "[d]enial of certification shall (continued...)

-3-                7460

governor, that the initiative's various provisions were confined to the single subject of "election reform" and it accordingly should be certified; the court directed that the State distribute petition booklets for the sponsors to collect signatures for placing the initiative on a future election ballot.[11]

The lieutenant governor and the State's elections office appeal the superior court's decision. But because the court correctly adhered to our prior interpretation of the relevant constitutional provisions — and because we reject the request to reverse precedent that the people's power to initiate laws generally is equivalent to that of the legislature — we affirm the court's decision.

## II.    CONSTITUTIONAL BACKDROP

### A.    Law-Making By Initiative

Understanding the one-subject rule's application to an initiative first requires understanding the people's law-making power under the Alaska Constitution. Article XI, section 1 provides in simple fashion: "The people may propose and enact laws by the initiative, and approve or reject acts of the legislature by the referendum."

The constitutional convention delegates debated extensively whether to include an initiative provision in the Alaska Constitution.[12] Delegates recognized that

---

[10]     (...continued)
be subject to judicial review"); AS 15.45.240 (authorizing superior court action to review lieutenant governor's determination).

[11]     *See* Alaska Const. art. XI, § 4 (stating procedures for initiative election); *see also* AS 15.45.090 (regarding petition preparation); AS 15.45.110 (regarding circulating petitions for signatures).

[12]     *See* 2 Proceedings of the Alaska Constitutional Convention (PACC) 929-82 (Dec. 16, 1955); *see also id.* at 931-33, 960 (statements of Del. Warren Taylor describing committee's research into initiative's history and other states' application); *id.* at 964
(continued...)

an initiative provision would be a check on the legislature.[13]  But they also recognized that an initiative provision should not apply to certain areas of law-making,[14] and

---

[12]     (...continued)
(statement of Del. Frank Barr) ("[T]he question is, 'Can the people trust the legislature?[']  If they can, there is no need for any initiative . . . . I believe the referendum is necessary, but the initiative is not necessary.  It is cumbersome, at least it is more so than our usual method of introducing bills in the legislature . . . ."); *id.* at 966 (statement of Del. Maynard Londborg) ("I will have to admit that on this particular item [the initiative] I would like to hear more or have a little time to think about it.  I have been on both sides of the question myself . . . ."); 4 PACC 2991 (Jan. 24, 1956) (statement of Del. Victor Fischer) ("I don't think the initiative is actually a view of the people as a whole, of the individual Alaskan.  Initiative lends itself only, almost exclusively, to use by pressure groups."); VICTOR FISCHER, ALASKA'S CONSTITUTIONAL CONVENTION 79-81 (1975) (summarizing delegates' debates on inclusion of initiative in Alaska Constitution).  The delegates eventually voted by a substantial majority (43 yeas, 10 nays, 2 absent) to adopt the article granting Alaskans the initiative right.  4 PACC 2992-93 (Jan. 24, 1956).

[13]     2 PACC 934 (Dec. 16, 1955) (statement of Del. Warren Taylor) ("It might be [there is] some very badly needed legislation but which the legislature would refuse to act upon. . . . [I]f that was the case, and the people had the right to initiate this legislation they could possibly cure the ills that were existing by reason of the legislature not working."); *id.* at 947 (statement of Del. W. O. Smith) ("That is one of the chief reasons why I support very strongly the inclusion of the initiative process in the constitution, even though it is not used, it is there.  I think that the legislators, if they know it is there, they will be very careful in ignoring the will of the people."); *id.* at 959 (statement of Del. M. R. Marston) ("When a man says 'I don't like that,' you can say 'You have a right.'  The people themselves can go into the courts of the land to have your word made law by a certain procedure."); *id.* at 967-68 (statement of Del. Douglas Gray) ("I believe that the real value of the initiative is not in its use.  It is in the fact it is there.  It is a threat.  That is the real value of the initiative."); *id.* at 978 (statement of Del. Frank Barr) ("I am against the basic idea of an initiative but I realize it has some value if it is in the constitution.  In fact it may be a deterrent on the actions of [the] legislature if they know it is there and could be used . . . .").

[14]     2 PACC 1272 (Jan. 5, 1956) (statement of Del. Jack Hinckel) ("The
(continued...)

article XI specifies limitations in section 7: "The initiative shall not be used to dedicate revenues, make or repeal appropriations, create courts, define the jurisdiction of courts or prescribe their rules, or enact local or special legislation."

The delegates voted late in the constitutional drafting process to include the initiative provision.[15] But the style and drafting committee had been using "by law" and "by the legislature" interchangeably in the constitutional text, raising concern there could be confusion whether the phrase "by law" applied to both the legislature's power and the people's initiative power.[16] To avoid confusion, the delegates included article XII, section 11, a general provision regarding law-making power: "*Unless clearly inapplicable*, the law-making powers assigned to the legislature may be exercised by the people through the initiative, subject to the limitations of [a]rticle XI." (Emphasis added.)

---

**14** (...continued)
Committee was very deliberate about writing this the way we did. We did not feel that the initiative should be used to propose constitutional amendments. We discussed it very thoroughly and there was no divided opinion."); 4 PACC 2837 (Jan. 21, 1956) (statement of Del. Victor Fischer) ("I personally am not a believer in the initiative; however, if you have it, let's be honest about it . . . . If you believe that certain items should be exempted let's put them in[] . . . and specifically exempt them from the initiative instead of going through each article, section by section, and by hidden meanings prevent the people from exercising the initiative."); 4 PACC 2967 (Jan. 24, 1956) (statement of Del. George Sundborg) (explaining that legislative branch committee created article XI, § 7 to address law-making by initiative and enumerate items "the Convention intended that the initiative should not apply to"); *id.* at 2977-87 (discussion regarding removing from initiative right power to create courts, define court jurisdiction, or prescribe court rules).

**15** 4 PACC 2992-93 (Jan. 24, 1956).

**16** 4 PACC 2820-30, 2835-51 (Jan. 21, 1956); *see id.* at 2841 (statement of Del. John Cross) ("[W]hen we were writing this constitution and these articles we made no distinction between 'legislature' and the 'law.' I am opposed to going ahead and making that distinction now. I can foresee hours and hours of debate on that.").

We previously have explained article XII, section 11's language: "The phrase 'unless clearly inapplicable' was included in the Alaska Constitution 'so that the initiative would not replace the legislature where the legislature's power serves as a check on other branches of government, such as legislative power to define courts' jurisdiction or override judicial rules.' "[17] Common sense about law-making determines when, under article XII, section 11, the people's law-making power is not co-equal with the legislature's: "To test whether the initiative is 'clearly inapplicable,' one must ask whether 'even 55 idiots would agree that it was inapplicable.' "[18] The constitutional provisions and the delegates' debates on the initiative thus make clear that the delegates intended the people's initiative law-making power be equivalent to the legislature's law-making power, except in specifically enumerated and other "clearly inapplicable" circumstances.[19]

---

[17] *Kohlhaas v. State, Office of Lieutenant Governor*, 147 P.3d 714, 717 (Alaska 2006) (quoting *Brooks v. Wright*, 971 P.2d 1025, 1029 (Alaska 1999)).

[18] *Id.* at 717 n.8 (quoting *Brooks*, 971 P.2d at 1028 (quoting 4 PACC 2849 (Jan. 21, 1956))); 4 PACC 2848-49 (Jan. 21, 1956) (statement of Del. George McLaughlin) ("All we are asking is that the Convention notes immediately that where we use in any article . . . 'by the legislature' or we have used in any article the proposal, the words 'the legislature,' unless those things obviously are inapplicable they are subject to the initiative and the referendum unless they are otherwise specifically excluded from the article on the initiative and referendum. . . . [W]e are clearly indicating here that where we use the expression 'by the legislature' or the expression 'the legislature' we mean completely, thoroughly and [we] wholeheartedly know that it is subject not only to the initiative but to the referendum, and where it is clearly inapplicable, even 55 idiots would agree that it was inapplicable."). The humorous reference to "55 idiots" arose from having 55 convention delegates; it was "the same number that drafted the United States Constitution." FISCHER, *supra* note 12, at 14.

[19] We have explained on numerous occasions our deferential view toward the people's initiative right. *See, e.g.*, *City of Fairbanks v. Fairbanks Convention & Visitors*

(continued...)

It is worth noting that the initiative is only one of numerous check and balance mechanisms found in our separation of powers form of government.[20] This particular people's check on government has much in common with constitutional referendum[21] and recall[22] rights:

> The initiative and referendum are devices that permit the electorate to participate directly in the law-making process.

---

[19] (...continued)
*Bureau*, 818 P.2d 1153, 1155 (Alaska 1991) ("The usual rule applied by this court is to construe voter initiatives broadly so as to preserve them whenever possible."); *Thomas v. Bailey*, 595 P.2d 1, 3 (Alaska 1979) ("The right of initiative . . . should be liberally construed to permit exercise of that right."). When reviewing a challenge to an initiative prior to its submission to voters, we liberally construe the constitutional and statutory requirements pertaining to the use of initiatives so that "the people [are] permitted to vote and express their will on the proposed legislation." *Boucher v. Engstrom*, 528 P.2d 456, 462 (Alaska 1974) (alteration in original) (quoting *Cope v. Toronto*, 332 P.2d 977, 979 (Utah 1958)), *overruled in part on other grounds by McAlpine v. Univ. of Alaska*, 762 P.2d 81 (Alaska 1988). "To that end 'all doubts as to technical deficiencies or failure to comply with the exact letter of procedure will be resolved in favor of the accomplishment of that purpose.' " *Municipality of Anchorage v. Frohne*, 568 P.2d 3, 8 (Alaska 1977) (quoting *Boucher*, 528 P.2d at 462).

[20] *See Bradner v. Hammond*, 553 P.2d 1, 5 (Alaska 1976). We discussed prior cases in which we stated: (1) the Alaska Constitution follows the traditional framework with three branches — executive, legislative, and judicial — of American government; (2) it can be fairly inferred that Alaska recognizes the separation of powers doctrine; and (3) that doctrine's underlying rationale "is the avoidance of tyrannical aggrandizement of power by a single branch of government." *Id.* We then stated: "The complementary doctrine of checks and balances must of necessity be considered in determining the scope of the doctrine of separation of powers." *Id.*

[21] Alaska Const. art. XI, § 1 ("The people may . . . approve or reject acts of the legislature by the referendum.").

[22] Alaska Const. art. XI, § 8 ("All elected officials in the State, except judicial officers, are subject to recall by the voters . . . . Procedures and grounds for recall shall be prescribed by the legislature.").

> Through the initiative the voters may enact legislation, and
> through the referendum they may veto laws passed by a
> recent legislature. Through the recall, the voters may remove
> an elected official from office. The initiative and referendum
> are known as "direct democracy" provisions. They first
> appeared in this country during the populist reform
> movement of the early twentieth century, and they are found
> in one form or another in about half of the state
> constitutions.[23]

There are corresponding checks on the people's right to initiate laws. One, involving restrictions on subject matter, is described above. Another is the legislature's power to effectively terminate an initiative by passing "substantially the same" legislation prior to an election.[24] We will later return to this checks and balances theme.

## B. One-Subject Rule

### 1. Constitutional history

Alaska's constitutional one-subject rule is contained in article II, section 13, entitled "Form of Bills":

> Every bill shall be confined to one subject unless it is an
> appropriation bill or one codifying, revising, or rearranging
> existing laws. Bills for appropriations shall be confined to
> appropriations. The subject of each bill shall be expressed in
> the title. The enacting clause shall be: "Be it enacted by the
> Legislature of the State of Alaska."

The one-subject rule's origins lie with the Roman Empire. The *Lex Caecilia Didia*, enacted in 98 B.C., was a legislative procedural law prohibiting unrelated

---

[23] GORDON HARRISON, ALASKA'S CONSTITUTION: A CITIZEN'S GUIDE 179 (5th ed. 2018), http://akleg.gov/docs/pdf/citizens_ guide.pdf.

[24] Alaska Const. art. XI, § 4 ("If, before the election, substantially the same measure has been enacted, the petition is void.").

provisions being combined within one bill (*lex satura*).[25] The one-subject rule has been used over the centuries to maintain clarity and transparency in law-making and to eliminate logrolling and riders.[26] "Log[]rolling consists of deliberately inserting in one bill several dissimilar or incongruous subjects in order to secure the necessary support for passage of the measure."[27] "Riders" are provisions often "unrelated to the main purpose of the bill"[28] that are "attached to bills that are popular and so certain of adoption that the rider will secure adoption not on its own merits, but on the merits of the measure to which it is attached."[29]

The first state to adopt a constitutional one-subject rule was Illinois, in

---

[25] ROBERT LUCE, LEGISLATIVE PROCEDURE: PARLIAMENTARY PRACTICES AND THE COURSE OF BUSINESS IN THE FRAMING OF STATUTES 548-49 (1922). The one-subject rule had a central place in Rome's history after an omnibus law proposed by Marcus Livius Drusus in 91 B.C. combined provisions on adding "three hundred members to the Senate, the taking of jurymen from the Senate instead of the equestrian order, the encouragement of emigration by devoting to that purpose the undistributed lands in Italy and the best part of Sicily, [and] the granting of the franchise to the Italian allies," among other provisions, into one law. *Id.* at 549; FRANK FROST ABBOTT, A HISTORY AND DESCRIPTION OF ROMAN POLITICAL INSTITUTIONS 101 (3d ed. 1911). The Senate struck down the law as a violation of the *Lex Caecilia Didia*, and ensuing events included Drusus's murder and a war between the Roman Republic and the Italian allies. LUCE, *supra*, at 548-49; ABBOTT, *supra*, at 101-02. Today's one-subject rule dispute is not surrounded by quite the same dramatic context.

[26] Millard H. Ruud, *No Law Shall Embrace More Than One Subject*, 42 MINN. L. REV. 389, 391 (1958).

[27] *Gellert v. State*, 522 P.2d 1120, 1122 (Alaska 1974); *see also Alaska Legislative Council v. Knowles*, 21 P.3d 367, 373 n.33 (Alaska 2001); Ruud, *supra* note 26, at 391.

[28] *Rider*, BLACK'S LAW DICTIONARY (11th ed. 2019).

[29] Ruud, *supra* note 26, at 391.

1818.[30]  By 1958, the year before Alaska officially reached statehood, nearly 40 states had adopted varying constitutional one-subject provisions.[31]  And the one-subject rule existed in Alaska well before statehood.[32]  Perhaps because the one-subject rule was such a common fixture, the delegates agreed with little fanfare to its inclusion in the Alaska Constitution.[33]

During the Constitution's creation, standing committees drafted proposed

---

[30]     *Id.* at 389.  Illinois's 1818 constitutional provision required that bills appropriating salaries for members of the legislature and government officials be limited to that single subject.  *Id.*

[31]     *Id.* at 390.  Ruud notes that although some states' constitutional provisions use the term "object" instead of "subject" there appears to be "no real difference" in how courts handle cases dealing with the one-subject or one-object rule.  *Id.* at 395-96.

[32]     The United States Congress formally organized the Territory of Alaska through passage of the 1912 "Second Organic Act."  Act of Aug. 24, 1912, ch. 387, 37 Stat. 512.  Section 8 of the Act provided:  "No law shall embrace more than one subject, which shall be expressed in its title."

[33]     Alaska is not the only state to have adopted a one-subject rule without substantive debate.  *See* Justin W. Evans & Mark C. Bannister, *The Meaning and Purposes of State Constitutional Single Subject Rules:  A Survey of States and the Indiana Example*, 49 VAL. U. L. REV. 87, 90 & n.13 (2014) (speculating on reasons for lack of single-subject-rule historical record and noting:  "[T]he rule had become so common by the late nineteenth century that new constitutional conventions included it in their constitutions as a matter of course.  Another likely explanation is that some states produced only journals that described the general procedural events of their constitutional conventions, neglecting to record the actual substance of the debates that took place."); *see also Migdal v. State*, 747 A.2d 1225, 1229 (Md. App. 2000) ("One reason for the relatively limited discussion, in Maryland constitutional history, of the reasons for the single-subject rule may be that it is one that has been applied for centuries.").

constitutional articles that were submitted to the delegates for consideration.[34] The Committee on Legislative Branch's proposal included a one-subject rule.[35] The committee explained that, despite deference to the legislature on form and procedure for enactment, the Constitution would require a bill to be "confined to one subject."[36] The committee also stated: "The use of riders on appropriation bills is prohibited, because of the abuses that have arisen in the Congress and in some states which do not have such a restriction."[37]

The delegates only briefly explained the one-subject rule's inclusion in the Alaska Constitution;[38] they expressly recognized that most states had adopted similar rules and that a one-subject rule would establish "minimum safeguards" in the bill enactment process.[39] Delegate Steve McCutcheon stated:

> The theory of requiring that all bills be confined to one subject with certain exceptions . . . is that nothing can be gotten through the legislature under the guise of some other things. Often times a bill that is very popular and has a great deal of public support and sentiment will have a rider attached to it which may defeat the very purpose of the bill or may pertain to some other idea entirely, and the theory

---

[34] FISCHER, *supra* note 12, at 36, 46-47, 56-59.

[35] Constitutional Convention Committee Proposal No. 5, § 16 (Dec. 14, 1955), http://www.akleg.gov/pdf/billfiles/ConstitutionalConvention/Folder%20310.5.pdf. The Committee on Legislative Branch made several revisions to the one-subject rule's language, most notably separating the one-subject rule from the one-title rule. *Compare id.*, *with id.* § 13 (Jan. 23, 1956).

[36] *Id.*, cmt. on § 16 (Dec. 14, 1955).

[37] *Id.*

[38] *See* 3 PACC 1746-47 (Jan. 11, 1956).

[39] *Id.* at 1747.

behind the requirement that each bill be confined to one subject indicates th[at] thinking.[40]

Returning to the checks and balances theme discussed earlier, it also is worth noting that in conjunction with other constitutional provisions — like the "direct democracy" provisions for the people to "veto" legislatively enacted laws through the referendum and directly initiate laws through the initiative[41] — the one-subject rule works to implement checks and balances in our form of government.[42] For example, under the Alaska Constitution a governor has the power to veto a legislative bill enacting a law, but only in its entirety, and the power to veto or reduce individual items in legislative appropriations bills,[43] which are immune from the one-subject rule.[44] Like the one-subject rule, the constitutional "item veto" for appropriations bills "originated as a reform measure to prevent legislators from 'logrolling' when they enact appropriation bills which necessarily address many subjects and need not be confined to a single subject, and to give governors some ability to limit state expenditures."[45] If the legislature could pass bills enacting laws about multiple subjects in the same way it can pass appropriation bills with multiple subjects, a "governor's veto power would be compromised because the legislature could pair a subject that the governor opposed with

---

[40]    *Id.* at 1746-47.

[41]    *See* HARRISON, *supra* note 23 and accompanying text.

[42]    *See Bradner v. Hammond*, 553 P.2d 1, 5 (Alaska 1976), discussed *supra* note 20 and accompanying text.

[43]    Alaska Const. art. II, § 15 ("The governor may veto bills passed by the legislature.  [The governor] may, by veto, strike or reduce items in appropriation bills.").

[44]    Alaska Const. art. II, § 13 (excepting appropriations bills from one-subject rule).

[45]    *Alaska Legislative Council v. Knowles*, 21 P.3d 367, 373 (Alaska 2001).

one that [the governor] favored."[46]

### 2. Our case law applying the one-subject rule

The delegates described the one-subject rule as a minimum safeguard to law-making, but they did not define "one subject." We therefore have identified its parameters when asked to apply the one-subject rule.

### a. *Gellert v. State*

Our seminal one-subject-rule decision is *Gellert v. State*.[47] That case involved the legislature's enactment of a bill to issue general obligation bonds funding (1) small boat harbor projects for coastal towns and villages and (2) a Fairbanks flood control project.[48] The bond proposition was ratified at a general election.[49] A lawsuit sought to block the bonds' issuance, in part on the ground that flood control and boat harbor projects were two distinct subjects in violation of the constitutional one-subject rule.[50] After a trial the superior court rejected this constitutional challenge.[51] On appeal we generally agreed that constitutional one-subject rules are primarily meant to restrain

---

[46] *See* HARRISON, *supra* note 23, at 63.

[47] 522 P.2d 1120 (Alaska 1974).

[48] *Id.* at 1120-21; *id.* at 1124 (Fitzgerald, J., dissenting).

[49] *Id.* at 1121 (majority opinion). Article IX, section 8 of the Alaska Constitution — yet another people's check on legislative power — provides in relevant part: "No state debt shall be contracted unless authorized by law for capital improvements . . . and ratified by a majority of the qualified voters of the State who vote on the question."

[50] *Gellert*, 522 P.2d at 1121.

[51] *Id.* at 1122.

legislative logrolling.[52] But we explained that such provisions should "be construed with considerable breadth" to avoid undue restrictions on the "scope and permissible subject matter" of legislation, which otherwise would result in "multiplying and complicating the number of necessary enactment[s] and their interrelationships."[53] We stated that one-subject-rule decisions "must be made on a basis of practicality and reasonableness" and generally must be analyzed "only in terms of the particular facts of each case."[54] We ultimately adopted the Minnesota Supreme Court's "germaneness" test:

> All that is necessary is that [the] act should embrace some one general subject; and by this is meant, merely, that all matters . . . should fall under some one general idea, be so connected with or related to each other, either logically or in popular understanding, as to be parts of, or germane to, one general subject.[55]

Turning to the case's facts, we declined to adopt the State's argument, accepted by the superior court, that with bond propositions the general subject is "the

---

[52]    *Id.*

[53]    *Id.* As one commentator on the Alaska Constitution puts it, our broad view of the one-subject rule is to show "deference to the judgment of the legislature on how best to structure individual pieces of legislation." *See* HARRISON, *supra* note 23, at 62.

[54]    *Gellert*, 522 P.2d at 1123.

[55]    *Id.* (quoting *Johnson v. Harrison*, 50 N.W. 923, 924 (Minn. 1891)). Other states have adopted this "germaneness" test. *See* Michael D. Gilbert, *Single Subject Rules and the Legislative Process*, 67 U. PITT. L. REV. 803, 826 (2006) (describing language of tests across jurisdictions and noting other states, including Pennsylvania, Maryland, and Kansas, follow "germaneness standard" adopted by Minnesota court); *see also* Richard Briffault, *The Single-Subject Rule: A State Constitutional Dilemma*, 82 ALB. L. REV. 1629, 1640-42 (2019) (discussing "germaneness" standard and variations state courts have adopted).

issuance of bonds for capital improvements";[56] we discerned a narrower single subject. We noted trial evidence showing that both projects would receive federal funding and be administered by the United States Army Corps of Engineers, that both projects were "part of a continuing program of federal-state cooperation in water resources development," and that preexisting law authorized the State to enter into both projects.[57] We concluded that the two "topics pertain[ed] to one ongoing plan for the development of water resources and to the method of funding that plan"[58] and that the plan logically and conveniently could encompass the flood control and boat harbor projects without violating the one-subject rule.[59]

### b. *North Slope Borough v. Sohio Petroleum Corp.*

Our next one-subject-rule case, *North Slope Borough v. Sohio Petroleum Corp.*, involved a legislative act that included provisions regarding income tax credits for fuel expenses, amendments to a state excise tax on cigarettes, and restrictions on municipalities' ability to tax.[60] The superior court concluded that the act violated the one-subject rule because it included two separate subjects: municipal taxation and state

---

[56] *Gellert*, 522 P.2d at 1121-23; *id.* at 1124 (Fitzgerald, J., dissenting).

[57] *Id.* at 1121, 1123 (majority opinion).

[58] *Id.* at 1123.

[59] *Id.* Justice Fitzgerald dissented, concluding that: (1) the generally accepted view seemed to be that the projects to be financed were a bond proposition's subject matter; (2) Fairbanks flood control and coastal small boat harbors were not the same subject matter; and (3) the bond proposition was a good example of logrolling because it was designed to gather voter support by linking projects in different areas of the state. *Id.* at 1124 (Fitzgerald, J., dissenting).

[60] 585 P.2d 534, 544-45 (Alaska 1978), *superseded by statute on other grounds*, ch. 23, §§ 2-3, SLA 1991, *as recognized in State, Commercial Fisheries Entry Comm'n v. Carlson*, 270 P.3d 755 (Alaska 2012).

taxation.[61] The State appealed, arguing that *Gellert*'s one-subject rule was "very liberal," that the challenged subject of "taxation" was more limited than *Gellert*'s subject of water resources development, and that the legislative record showed no indication of logrolling, inadvertence, stealth, or fraud.[62]

We reiterated that what constitutes one subject is to be liberally construed[63] and that no act will be set aside for failure to comply with the one-subject rule "except where the violation is both substantial and plain."[64] Because the state and municipal tax provisions were intertwined and had a direct impact on state tax revenue, we held that

---

[61]     *Id.* at 545.

[62]     Brief of Appellant State of Alaska at 50-55, *North Slope Borough*, 585 P.2d 534 (Nos. 3460/3513/3659).

[63]     *North Slope Borough*, 585 P.2d at 545 (citing *Gellert*, 522 P.2d 1120).

[64]     *Id.* (citing *Suber v. Alaska State Bond Comm.*, 414 P.2d 546, 557 (Alaska 1966)). *Suber v. Alaska State Bond Committee*, a post-statehood decision, actually was our first consideration of the one-subject rule. *See* 414 P.2d at 556-57. *Suber* involved legislation providing financial relief for some mortgage and lienholders on homes destroyed in the 1964 earthquake. *Id.* at 549. A taxpayer raised several constitutional challenges to the act, including that it violated article II, section 13's one-subject rule and its related requirement that a bill's subject be expressed in its title, because the act included an unnoted criminal provision authorizing punishment for false statements or misrepresentations to obtain financial relief under the act. *Id.* at 556-57, 556 n.23. Drawing on territorial court interpretation of the one-subject rule in Alaska's Second Organic Act, we explained that the constitutional rule is intended to prevent logrolling and "to guard against inadvertence, stealth and fraud in legislation." *Id.* at 557. We stated that when considering adherence to the one-subject rule, courts should "disregard mere verbal inaccuracies, resolve doubts in favor of validity," and set aside an enactment only if the violation were "substantial and plain." *Id.* We concluded that the criminal sanctions provision was related to the subject expressed in the act's title and did not violate the one-subject rule. *Id.*

"[s]tate taxation is not an unduly broad category under the one[-]subject rule"[65] and concluded that there was no constitutional violation.[66]

### c. *Short v. State*

In a subsequent one-subject-rule case, *Short v. State*, we stated: "[I]t is apparent that the *Gellert* test requires no more than that the various provisions of [a] single legislative enactment fairly relate to the same subject, or have a natural connection therewith."[67] That case involved another voter-approved legislative bond package,[68] unsuccessfully challenged in superior court under the one-subject rule for combining public safety and correctional facilities capital projects.[69] The public safety buildings were for "state troopers, fish and wildlife protection, a motor vehicles division, a fire prevention division" — essentially all public safety services "the Fairbanks and Soldotna regions" needed.[70] The correctional facilities were "pre-trial detention facilities, juvenile offender institutions and new jail facilities in various regions of the state."[71]

On appeal we concluded that the bond proposition projects fell within the single subject of "general public safety function of protecting life and property."[72] We

---

[65]     *North Slope Borough*, 585 P.2d at 545.

[66]     *Id.* at 546.

[67]     600 P.2d 20, 24 (Alaska 1979).

[68]     *See Gellert*, 522 P.2d at 1121; *see also* Alaska Const. art. IX, § 8 (requiring voter approval of statutes authorizing capital improvements).

[69]     *Short*, 600 P.2d at 21-22.

[70]     *Id.* at 22 n.2.

[71]     *Id.*

[72]     *Id.* at 24-25.

expressly rejected the challenger's argument that the one-subject rule requires a stricter standard when measures are submitted to voters,[73] reasoning that *Gellert* also involved a bill ratified by voters and that the policies behind the one-subject rule are the same whether the law is before voters or the legislature:

> The argument that measures submitted to the voters are deserving of enhanced protection under the one-subject rule of art[icle] II, [section] 13 of the state constitution has little merit. . . . The one-subject rule is not restricted to those legislative acts which also must be approved by the voters; rather, it applies equally to all enactments of the legislature. Further, we have applied the provision to bond propositions in the past in the same way as it has been applied to other types of legislation. Thus, there does not appear to be any valid purpose to be served by adopting a more restrictive interpretation of article II, [section] 13 of the state constitution in cases where voters either initiate or ratify proposed legislation in their capacity as the larger legislative

---

[73] The State argued that our one-subject review of a voter-approved act should be *even more* deferential than in the pure legislative act context:

> The single-subject provision is a constitutional requirement imposed regardless of whether the act is to be presented to the voters for their approval, and essentially provides that the only reason an act will be set aside for failure to comply with the single subject provision is when the violation is both "substantial and plain." However, it is clear that the substantial and plain rule is even more stringently applied when the issue is one presented to the voters. At that point, only *substantial bias* plus *substantial error* can permit a court to overturn an act . . . .

Brief of Appellee State of Alaska at 29-30, *Short*, 600 P.2d 20 (No. 4578), (emphases in original) (citations omitted).

body of the state.[74]

### d. *State v. First National Bank of Anchorage*

Questions about the *Gellert* test's feasibility were raised in *State v. First National Bank of Anchorage*.[75] In that case the State sued certain defendants under provisions of the Uniform Land Sales Practices Act for misleading statements and omissions related to the sale of real property.[76] One defendant claimed the Act violated the one-subject rule because of amendments enacted in 1977.[77] The amendments (1) "br[ought] in-state sales of subdivided land within the Act's scope and . . . add[ed] a general antifraud section" and (2) changed separate Alaska Land Act provisions "pertain[ing] to the leasing of state-owned lands and the Division of Land's zoning power."[78] The superior court declined to decide the single-subject challenge, ruling on

---

[74] *Short*, 600 P.2d at 22 n.4 (citation omitted). *Short*, of course, did not involve application of the constitutional one-subject rule to a voter-proposed initiative; our comment about initiatives thus was dictum. *See VECO, Inc. v. Rosebrock*, 970 P.2d 906, 922 (Alaska 1999) ("Dicta is defined as '[o]pinions of a judge which do not embody the resolution or determination of the specific case before the court.' " (alteration in original) (quoting *Dicta*, BLACK'S LAW DICTIONARY (6th ed. 1990))); *Scheele v. City of Anchorage*, 385 P.2d 582, 583 (Alaska 1963) ("We look upon what we said in [a previous] case . . . as obiter dictum, since it was not necessary to the decision in the case."), *superseded by statute on other grounds*, AS 09.65.070.

[75] 660 P.2d 406, 414-15 (Alaska 1982).

[76] *Id.* at 408-10.

[77] *Id.* at 414.

[78] *Id.*

other grounds.[79]  We considered the challenge on appeal.[80]

Citing *North Slope Borough* and *Gellert*, the State argued that the challenger had not met his substantial burden to prove a one-subject rule violation.[81]  The State emphasized the "liberal construction in favor of the validity" we previously applied to legislative acts challenged under the one-subject rule, arguing that even if the challenged amendments to the Act contained numerous provisions under the broad title of "land" they all were "obviously and logically connected."[82]  Countering the challenger's argument on appeal that if "land" can be a proper subject the one-subject rule has no meaning, the State observed that an act relating to "land" or "transportation" would not be logically connected if it were to "include provisions dealing with unemployment compensation, child labor laws, state funding of abortions, or state usury laws," thus making the one-subject rule meaningful.[83]

We determined that the Act's challenged amendments satisfied the one-subject rule under the subject of "land,"[84] but we acknowledged:

---

[79]  *Id.*

[80]  *Id.* at 414-15.

[81]  Brief of Appellee State of Alaska at 69, *Brown v. State, consolidated on appeal with First Nat'l Bank of Anchorage*, 660 P.2d 406 (Nos. 5006/5107/5085).

[82]  *Id.* at 70-74.  The State further explained how broadly it asked us to construe the subject of a legislative act by quoting the Minnesota Supreme Court: "The term 'subject,' as used in the constitution, is to be given a broad and extended meaning, so as to allow the legislature full scope to include in one act all matters having a logical or natural connection."  *Id.* at 71 (quoting *Wass v. Anderson*, 252 N.W.2d 131, 137 (Minn. 1977)).

[83]  *Id.* at 74.

[84]  *First Nat'l Bank of Anchorage*, 660 P.2d at 414-15.

Were we writing on a clean slate, we would be inclined to find this subject impermissibly broad. Permitting such breadth under the one-subject rule could conceivably be misconstrued as a sanction for legislation embracing "the whole body of the law." Nevertheless, while the issue is indeed close, we are unable to say that the legislature has transgressed the limits of article II, section 13 established by prior decisions of this court.[85]

### e. *Yute Air Alaska, Inc. v. McAlpine*

*Yute Air Alaska, Inc. v. McAlpine* is our first case directly addressing the one-subject rule in the initiative context.[86] The proposed initiative would "repeal statutes regulating motor and air carriers . . . , open the carrier business to . . . all financially responsible persons, prohibit municipalities from regulating these activities, and require the governor to seek repeal of the federal statute . . . which requires the use of United States vessels for shipping goods between United States ports."[87] The lieutenant governor's initiative certification was unsuccessfully challenged in superior court, in part on the one-subject rule,[88] and allowed on the ballot.[89]

The challengers appealed, arguing that combining provisions about state and local transportation regulations with provisions about a federal maritime statute

---

[85] *Id.* at 415 (citation omitted) (quoting *Trumble v. Trumble*, 55 N.W. 869, 870 (Neb. 1893)).

[86] 698 P.2d 1173, 1175 (Alaska 1985).

[87] *Id.*

[88] *Id.* at 1175, 1179.

[89] *Id.* at 1179. Voters approved the initiative in a general election several months before our decision was issued. *See* STATE OF ALASKA, DIV. OF ELECTIONS, *Initiative History* 3 (June 24, 2019), http://www.elections.alaska.gov/doc/forms/H26.pdf.

violated the one-subject rule.[90]  The State countered by agreeing with our *Short* dictum that the constitutional one-subject rule applies equally to legislation and initiatives,[91] arguing that "the Alaska Constitution makes the law[-]making power equal between the legislature and the electorate."[92]  The State again emphasized our case law setting out a liberal construction of the one-subject rule and the requirement that alleged violations of the rule "must be substantial and plain before the court will declare a bill invalid."[93]  The State then argued that the proposed initiative focused on the single subject of alleviating the negative economic effects of unnecessary transportation regulation on commercial enterprise in Alaska, and particularly on abolishing anti-competitive practices.[94]  Arguing that the case's facts were more like *Gellert* than *First National Bank of Anchorage*, the State countered the challengers' argument by stating that "the logrolling of similar subjects is not a proscribed activity."[95]

---

[90]     *Yute Air*, 698 P.2d at 1175.

[91]     *Short v. State*, 600 P.2d 20, 22 n.4 (Alaska 1979); *but see supra* text accompanying note 74.

[92]     Brief of Appellee State of Alaska at 27, *Yute Air*, 698 P.2d 1173 (No. S-548) (citing Alaska Const. art. XII, § 11).

[93]     *Id.* at 26-28.

[94]     *Id.* at 28-30.

[95]     *Id.* at 29-31.  This is an important point, but one we have not had occasion to address.  In *Gellert* we generally defined logrolling as "deliberately inserting in one bill several dissimilar or incongruous subjects . . . to secure the necessary support for passage of the measure."  522 P.2d 1120, 1122 (Alaska 1974).  But logrolling can be more broadly defined as "the practice of several minorities combining their several proposals as different provisions of a single bill and thus consolidating their votes so that a majority is obtained for the omnibus bill where perhaps no single proposal of each minority could have obtained majority approval separately."  Ruud, *supra* note 26, at
(continued...)

We relied on a common sense reading of the initiative, noting: "To the miner at Minto who wants to bring his supplies from Seattle, the interaction and interrelation [of Alaskan intrastate and federal interstate provisions] is more than just self-evident — it is glaringly so."[96] We concluded, in light of previously approved legislation covering broad subject matter, that it was rational and convenient to combine the initiative's various provisions into one bill under the subject of "transportation."[97] We further explained that the initiative's provisions all contained "a common thread narrower than 'transportation' ": the provisions related to eliminating "regulations and statutes thought to create needless transportation costs."[98]

---

[95]    (...continued)
391.  This distinction matters because in practice legislators often engage in political bargaining resulting in various provisions being combined in one bill.  John G. Matsusaka & Richard L. Hasen, *Aggressive Enforcement of the Single Subject Rule*, 9 ELECTION L.J. 399, 405 (2010) ("It should be recognized that legislatures rely extensively on logrolls to implement their agreements.  Indeed, without the ability to logroll it is hard to imagine how complicated legislative bargains could be struck and enforced."); *Unity Church of St. Paul v. State*, 694 N.W.2d 585, 592 n.3 (Minn. App. 2005) ("Dissimilar or nongermaneness is the key word.  That cannot be lost in all the smoke and mirrors that surround this debate.  Legislation that someone claims is 'log[]rolling legislation' has always been permissible when *similar* subjects are united in one bill and the bill is passed by a combination of legislators, all of whom are united in wanting their part of the bill to go through." (emphasis in original)).

[96]    *Yute Air Alaska, Inc. v. McAlpine*, 698 P.2d 1173, 1175 (Alaska 1985).

[97]    *Id.* at 1175, 1181-82.

[98]    *Id.* at 1182.  Justice Moore dissented, believing that it was wrong to continue giving the one-subject rule liberal interpretation.  *Id.* (Moore, J., dissenting). Contending that the *Gellert* "standard seems to be no standard at all," he proposed the test simply be that "all matters treated should be logically connected" and "*reasonably interdependent*." *Id.* at 1185-86 (emphasis in original).  Justice Burke dissented on the same ground.  *Id.* at 1189 (Burke, J. dissenting).

### f.     *Evans ex rel. Kutch v. State*

In *Evans ex rel. Kutch v. State* we briefly discussed the one-subject rule when upholding 1997 tort reform legislation.[99] The legislation was codified into various sections of the Alaska Statutes and

> included many new tort law provisions, including caps on noneconomic and punitive damages, a requirement that half of all punitive damages awards be paid into the state treasury, a ten-year "statute of repose," a modified tolling procedure for the statute of limitations as applied to minors, comparative allocation of fault between parties and non-parties, a revised offer of judgment procedure, and partial immunity for hospitals from vicarious liability for some physicians' actions.[100]

After noting that we, and the court of appeals, had upheld "legislation that was in some cases very broad," we concluded that the various tort reform provisions fell "within the single subject of 'civil actions.' "[101]

---

[99]     56 P.3d 1046, 1069-70 (Alaska 2002).

[100]     *Id.* at 1048 (footnotes omitted).

[101]     *Id.* at 1069-70.  We cited two court of appeals' decisions:

> *Galbraith v. State*, 693 P.2d 880, 885-86 (Alaska App. 1985) (legislation modifying various diverse aspects of the criminal law — sexual assault, assault, presumptive sentences for certain felony offenders, telephonic search warrants, disposal of seized and recovered property, the insanity defense, the defense of necessity, joyriding, immunity, sentencing procedure — is within one subject, "criminal law"); *Van Brunt v. State*, 646 P.2d 872, 874-75 (Alaska App. 1982) (statute relating to sale of alcohol and to drunk driving is within one subject, "intoxicating liquor").

*Id.* at 1069 n.136.

### g. *Croft v. Parnell*

We struck a proposed initiative for violating the one-subject rule in *Croft v. Parnell*.[102] In that case the lieutenant governor denied certification of a "clean elections" initiative that would publicly fund state elections through a new oil production tax, with a non-binding directive to transfer excess tax funds to the Permanent Fund Dividend.[103] The superior court upheld the lieutenant governor's certification denial, explaining that there was no connection between the type of revenue created and the type of program the initiative established.[104]

On appeal the State argued that the one-subject rule extends to initiatives and that the purpose of the rule is to prevent logrolling.[105] The State acknowledged our deferential standard for determining whether the rule has been violated, but it did not ask that we change that standard or that we adopt a stricter standard for initiatives.[106] The State instead argued that "[e]ven under the most deferential of standards . . . oil taxes and campaign finance are different subjects,"[107] that there was "no logical connection between oil taxation and campaign finance,"[108] and that logrolling was a large concern

---

[102] 236 P.3d 369, 371-74 (Alaska 2010).

[103] *Id.* at 370-71.

[104] *Id.* at 372.

[105] Brief of Appellees State of Alaska at 7-11, *Croft*, 236 P.3d 369 (No. S-13200).

[106] *Id.* at 8.

[107] *Id.*

[108] *Id.* at 10.

in light of the focus on oil taxes.[109]

We noted the need to balance the one-subject rule's purpose against the need for legislative efficiency and indicated that "[o]ur solution" has been to apply the one-subject rule broadly,[110] but we rejected the initiative sponsors' argument that the initiative's provisions could be related under the subject of "clean elections."[111] We explained that in the initiative context the one-subject rule "protects the voters' ability to effectively exercise their right to vote by requiring that different proposals be voted on separately," "allows voters to express their will through their votes more precisely," and prevents logrolling, stealth, and fraud.[112] We noted that the initiative "proposed the creation and 'soft dedication' of a new revenue source, *and* proposed the creation of an entirely new government program."[113] We concluded that, because the Alaska Constitution prohibits earmarking tax revenues, "a 'soft dedication' cannot be considered for purposes of a single-subject analysis and therefore cannot be used to make two independent provisions of an initiative address one subject."[114] We ultimately held that combining the distinct proposals for an oil production tax and election campaign finance reform "r[an] afoul of the single-subject rule" by depriving voters of the opportunity to

---

[109]     *Id.* at 10-11.

[110]     *Croft v. Parnell*, 236 P.3d 369, 372-73 (Alaska 2010).

[111]     *Id.* at 374.

[112]     *Id.* at 372.

[113]     *Id.* at 373 (emphasis in original). We concluded the non-binding directive that the legislature transfer excess tax revenue to the Permanent Fund Dividend was entirely unrelated to the clean election program and an example of logrolling. *Id.* at 374.

[114]     *Id.* at 374.

vote on each separate proposal.[115]

## III. THIS INITIATIVE

### A. Facts And Proceedings

#### 1. Initiative

Alaskans for Better Elections is a ballot initiative committee (Committee)[116] seeking to place on a future ballot an initiative entitled:[117]

> An Act prohibiting the use of dark money by independent expenditure groups working to influence candidate elections in Alaska and requiring additional disclosures by these groups; establishing a nonpartisan and open top four primary election system for election to state executive and state and national legislative offices; changing appointment procedures relating to precinct watchers and members of precinct election boards, election district absentee and questioned ballot counting boards, and the Alaska Public Offices Commission; establishing a ranked-choice general election system; supporting an amendment to the United States Constitution to allow citizens to regulate money in Alaska elections; repealing the special runoff election for the office of United States Senator and United States Representative; requiring certain written notices to appear in election pamphlets and polling places; and amending the definition of "political party."

The initiative contains 74 sections, all but two of them amending current provisions of

---

[115] *Id.* at 373.

[116] *See* AS 15.45.030(3) (requiring that initiative application designate three-sponsor committee to represent all sponsors and subscribers in matters relating to initiative).

[117] *See* Alaska Const. art. II, § 13 ("The subject of each bill shall be expressed in the title."); AS 15.45.040(2) (requiring proposed initiative bill to contain "the subject of the bill" in its title).

Title 15, Alaska's Election Code. The initiative most significantly changes Alaska's election laws by: (1) replacing Alaska's current party-based primary system with an open, nonpartisan primary; (2) establishing ranked-choice voting in general elections; and (3) adopting new disclosure and disclaimer requirements for independent expenditure groups and their donors.

### 2. Certification denial

In July 2019 the Committee submitted an initiative application to Lieutenant Governor Kevin Meyer.[118] The Division of Elections designated the ballot initiative as "19AKBE."[119] The lieutenant governor requested legal review by Attorney General Kevin Clarkson,[120] who recommended certification denial.[121] The attorney general concluded that the initiative was not in the proper form because it contained more than one subject in violation of the Alaska Constitution.[122] Briefly, the attorney general's constitutional analysis focused on concerns we have expressed about the *Gellert* test's possible over-broadness[123] and our rejection of the proposed initiative in

---

[118] *See* Alaska Const. art. XI, § 2 (requiring initiative application be filed with lieutenant governor); AS 15.45.020 (same).

[119] *See* AS 15.45.245 (authorizing lieutenant governor to delegate initiative-related duties to Division of Elections).

[120] *See* Alaska Const. art. XI, § 2 (providing for lieutenant governor's review of initiative for proper form); AS 15.45.070 (requiring lieutenant governor to review initiative application within 60 days and either certify or state reasons for denial).

[121] STATE OF ALASKA, DEP'T OF LAW, OP. ATT'Y GEN., 2019200578 (Aug. 29, 2019), http://www.law.state.ak.us/pdf/opinions/opinions_2019/19-003_2019200578.pdf.

[122] *Id.* at 10, 13.

[123] *Id.* at 7-8.

*Croft*.[124] The attorney general concluded that the initiative raised the concerns identified in *Croft* and therefore violated the constitutional one-subject rule.[125] On August 30 the lieutenant governor denied certification based on the attorney general's opinion.

### 3.  Superior court proceedings

Days later the Committee filed suit in superior court against the lieutenant governor and the Division of Elections (collectively, the State), seeking a declaration that the initiative is in proper form and does not violate the Alaska Constitution and requesting injunctive relief directing certification and distribution of initiative petition booklets.[126] The parties agreed to an expedited briefing schedule and filed cross-motions

---

[124]    *Id.* at 8-9.

[125]    *Id.* at 10, 13.

[126]    Alaska Statute 15.45.090(a) provides:

If the application is certified, the lieutenant governor shall prepare a sufficient number of sequentially numbered petitions to allow full circulation throughout the state. Each petition must contain

(1) a copy of the proposed bill;

(2) an impartial summary of the subject matter of the bill;

(3) a statement of minimum costs to the state associated with certification of the initiative application and review of the initiative petition, excluding legal costs to the state and the costs to the state of any challenge to the validity of the petition;

(4) an estimate of the cost to the state of implementing the proposed law;

(continued...)

for summary judgment. The superior court held oral arguments in mid-October.

The superior court ruled in the Committee's favor in late October, rejecting the State's contention that *Croft* provided "new guidance" on the one-subject test. The court instead quoted *Gellert*'s holding that Alaska's decades-old one-subject test is construed "with considerable breadth" and concluded that the test applies equally to legislation and initiatives.[127] Explaining that the initiative's substantive provisions all related to election reform, the court quoted *Yute Air* and found "no indication that the [initiative's] provisions are targeted to different constituencies or that any of the provisions were calculated to obtain sufficient votes to pass the proposed initiative by attaching something of popularity 'likely to carry along the enactment of whatever state law is attached for the ride.' "[128] The court ordered that the State immediately distribute petition booklets for the sponsors to collect signatures for placing the initiative on a future election ballot. The State moved for a stay pending appeal; the court denied the request. Final judgment was entered in early November.

---

[126]    (...continued)

(5) the statement of warning prescribed in AS 15.45.100;

(6) sufficient space for the printed name, a numerical identifier, the signature, the date of signature, and the address of each person signing the petition; and

(7) other specifications prescribed by the lieutenant governor to ensure proper handling and control.

[127]    522 P.2d 1120, 1122 (Alaska 1974).

[128]    *See* 698 P.2d 1173, 1189 (Alaska 1985) (Moore, J., dissenting).

### 4.      This appeal

The State appealed, asking for "extremely expedited consideration of this appeal," arguing that because the Committee was gathering signatures for the initiative, any delay might cause us to feel "constrained by the sponsors' mounting reliance interests, which will increase every day." The State pointed to *Yute Air*'s language regarding our reluctance to invalidate an initiative because "the sponsors of the initiative . . . relied on our precedents in preparing the present proposition and undertaking the considerable expense and time and effort needed to place it on the ballot."[129]

We denied "extremely expedited" consideration but agreed to expedite the appeal, noting we would "give full and fair consideration to this appeal's legal merits, including [the State's] stated intent to ask us to reverse long-standing precedents."[130] After expedited briefing, the parties argued the case to us on February 19, 2020.

## IV.   DISCUSSION

We turn now to the State's arguments, making clear their specific nature. At oral argument before us, the State conceded that, had the initiative bill been passed by the legislature, the bill would comply with the one-subject rule; that is a well-made concession, as we discuss further below. The State's arguments instead are that (1) in *Croft* we modified the *Gellert* test for an initiative's compliance with the one-subject rule — making the test more stringent for initiatives so voters have the ability to vote on separate topics — and, if not, (2) we should overrule our precedent holding that initiatives and legislation generally are on even footing for compliance with the one-subject rule and adopt a more stringent test for initiatives.

---

[129]    *See id.* at 1181, discussed *supra* pp. 22-23.

[130]    *Meyer v. Alaskans for Better Elections*, No. S-17629 (Alaska Supreme Court Order, Nov. 5, 2019).

-32-                                                    7460

**A.**    ***Croft* Did Not Establish A Different Test For Initiatives.**

The superior court ruled that *Croft* did not create a different one-subject-rule test for initiatives but rather was consistent with and followed our long-existing *Gellert* test precedent.[131] That *Croft* did not overrule or modify previous one-subject-rule decisions to create a different test for initiatives is a simple and straightforward conclusion; in *Croft* we articulated tangible boundaries to help identify whether the initiative went too far beyond the parameters of "one subject."[132] We first focused on the initiative's magnitude and means of achieving "clean elections."[133] We reasoned that the proposed initiative created (1) a new oil-production tax and (2) a new and unrelated government program to fund state office election campaigns.[134] We decided the two provisions were of such magnitude as to be distinct and unrelated subjects,[135] and we additionally noted the strong appearance of logrolling different subjects to garner support for the initiative.[136]

---

[131]    "We review a trial court's legal analysis de novo, applying 'the rule of law that is most persuasive in light of precedent, reason, and policy.'" *Dan v. Dan*, 288 P.3d 480, 482 (Alaska 2012) (quoting *Vezey v. Green*, 171 P.3d 1125, 1128-29 (Alaska 2007)).

[132]    236 P.3d 369, 373-74 (Alaska 2010).

[133]    *Id.*

[134]    *Id.* at 371, 373.

[135]    *Id.* at 373-74.

[136]    *Id.* at 374. We expressly agreed with the superior court's observation that "record oil and gas prices, high oil company profits, the Exxon Valdez litigation, and controversy regarding a proposed gas pipeline" made the oil industry a topic that appeared to have been included to logroll support from different constituencies. *Id.* We further noted that the initiative's varied provisions were likely to evoke strong feelings

(continued...)

We did not completely rule out the possibility that the two distinct topics could be germane to each other,[137] but we concluded that the connection was not obvious.[138] We required a factual demonstration of a nexus,[139] and we noted that the sponsors' submission of "two newspaper articles and a listing of the top groups lobbying the Alaska legislature" was "insufficient to demonstrate a clear or established connection between the oil industry and a need for public financing of state electoral campaigns."[140] This inquiry was consistent with the *Gellert* test, requiring that "all matters treated" should be connected or related with each other "as to be parts of, or germane to, one general subject."[141] Without evidence showing a link "between the oil industry and a need for public financing of state electoral campaigns," the initiative's distinct topics

---

[136] (...continued)
in voters because of its focus on the oil industry. *Id.* There was a substantial risk that the initiative would tap a voter's strong feelings regarding one provision to support the other distinct provision. *Id.* But the most obvious demonstration of logrolling was the initiative's inclusion of a non-binding directive to transfer leftover oil tax funds to the Permanent Fund Dividend. We viewed this provision, which was "entirely unrelated to the purpose of the clean elections program," as a transparent attempt to garner voter support for the initiative with the suggestion that voters would receive larger Permanent Fund Dividend payments if the initiative became law. *Id.* And this logrolling discussion was consistent with *Gellert*'s explanation that "the primary aim of 'one-subject' provisions in state constitutions is the restraint of logrolling in the legislative process." *See Gellert v. State*, 522 P.2d 1120, 1122 (Alaska 1974).

[137] *See Croft*, 236 P.3d at 374.

[138] *See id.*

[139] *See, e.g.*, *Gellert*, 522 P.2d at 1121, 1123 (reviewing evidence produced at trial).

[140] *Croft*, 236 P.3d at 374.

[141] *Gellert*, 522 P.2d at 1123 (quoting *Johnson v. Harrison*, 50 N.W. 923, 924 (Minn. 1891)).

could not be joined under the subject of "clean elections."[142]

We note that in *Croft* the State did not ask us to establish a different one-subject-rule test for initiatives,[143] and we certainly did not say we were doing so.[144] We did not differentiate between improper legislative and initiative logrolling.[145] And we did not disturb our *Yute Air* ruling that "[a] one[-]subject rule for initiatives which is more restrictive than the rule for legislative action is not permitted."[146] In short, we affirm the superior court's conclusion that *Croft* did not establish a new and different one-subject-rule test for initiatives.

### B. We Decline To Overrule *Yute Air*.

The State alternatively argues that if the original *Gellert* test still applies to initiatives after *Croft*, we "should overrule [that precedent] and restore substance to the single-subject rule to protect voter choice in the initiative context." The State notes that some members of the court previously "expressed skepticism" because the *Gellert*

---

[142]     *Croft*, 236 P.3d at 374. We added a consideration to the *Gellert* test: We will not accept a proposed nexus for the distinct provisions if that nexus runs afoul of other constitutional prohibitions. *Id.* We rejected the initiative sponsors' argument that the three-cent oil barrel tax to fund the public campaign program was merely a "soft dedication" of funds, and we explained that the Alaska Constitution "expressly prohibits the binding dedication of state revenues for specific projects." *Id.* at 371, 372, 374 & n.21 (citing Alaska Const. art. IX, § 7, art. XI, § 7). If the only connection between an initiative's distinct provisions is an unconstitutional one, then the distinct provisions cannot together constitute "one subject." *See id.* at 374.

[143]     *Cf.* Brief of Appellees State of Alaska at 7-11, *Croft*, 236 P.3d 369 (No. S-13200).

[144]     *See Croft*, 236 P.3d at 372-74.

[145]     *See id.* at 374.

[146]     698 P.2d 1173, 1181 (Alaska 1985); *see Croft*, 236 P.3d at 372-74.

test is "extremely lax," and the State specifically requests that we overrule our *Yute Air* holding that the *Gellert* test applies equally to legislation and initiatives. The State now argues — contrary to its argument to us in *Yute Air*[147] — that the one-subject rule is only a procedural limitation to law-making, that the Alaska Constitution therefore allows a stricter standard for initiatives, and that a stricter one-subject standard for initiatives would allow voters to more precisely express their will. Finally, the State proposes a one-subject standard for initiatives that would "consider both how the parts of an initiative are inter-related and the overall significance of each reform."

The Committee counters that the State has not met its high burden of overcoming the presumption of stare decisis.[148] The Committee argues: "For the people to have equal law[-]making power to the legislature, the single-subject rule must be equally applied." And the Committee contends that the State's proposed stricter one-subject standard for initiatives "is unworkable in practice, would hamstring the ability of Alaskans to enact laws by initiative, and would completely muddy the waters in an otherwise clear area of the law."

We agree with the Committee that imposing a stricter one-subject standard to initiatives than to legislation would run counter to the delegates' intent that the initiative serve as the people's check on the legislature. Under our system of checks and balances, when the legislature fails to pass laws the people believe are needed, the people have the initiative power to create those laws. And one driving force behind article XII, section 11 was identifying clearly the people's broad law-making power, preventing

---

[147]     *See* discussion *supra* pp. 22-23.

[148]     *See Stare decisis*, BLACK'S LAW DICTIONARY (11th ed. 2019) (meaning "to stand by things decided" and requiring courts to follow precedent when same points again arise).

confusion about its extent.[149]

The State nonetheless contends we should impose a stricter one-subject standard for initiatives that would (1) require interrelatedness between the various provisions and (2) "consider the overall significance of an initiative's provisions." The State notably made no suggestion in its briefing that the legislature should be subject to this stricter one-subject standard, and at oral argument before us the State conceded that it was not seeking a stricter one-subject standard that would affect the legislature.[150] The State recognized at oral argument that applying a stricter one-subject standard would be

---

[149]    *See* 4 PACC 2840 (statement of Del. M. R. Marston) (Jan. 21, 1956) and discussion *supra* pp. 4-7; *Yute Air*, 698 P.2d at 1181 ("[The dissent's] contention . . . that the single[-]subject requirement should be more strictly applied in the initiative (as opposed to legislative) context not only is adverse to our deferential attitude toward initiatives, it also ignores the explicit constitutional directive [of article XII, section 11] to the contrary.").

[150]    We note examples of the common legislative practice of passing sweeping laws containing provisions that probably would not have met the State's proposed stricter one-subject standard because not all of their various provisions were interrelated or interdependent. *See Evans ex rel. Kutch v. State*, 56 P.3d 1046, 1048, 1069-70 (Alaska 2002) (involving tort reform legislation, with new provisions "including caps on noneconomic and punitive damages, a requirement that half of all punitive damages awards be paid into the state treasury, a ten-year 'statute of repose,' a modified tolling procedure for the statute of limitations as applied to minors, comparative allocation of fault between parties and non-parties, a revised offer of judgment procedure, and partial immunity for hospitals from vicarious liability for some physicians' actions" (footnotes omitted)); *State v. First Nat'l Bank of Anchorage*, 660 P.2d 406, 414 (Alaska 1982) (involving 1977 amendments to Uniform Land Sales Practices Act that brought "in-state sales of subdivided land within the Act's scope," added "a general antifraud section," and included "various amendments to the Alaska Land Act pertain[ing] to the leasing of state-owned lands and to the Division of Lands' zoning power"); *see also Galbraith v. State*, 693 P.2d 880, 885-86, 885 n.7 (Alaska App. 1985) (modifying various aspects of criminal law, including sexual assault, assault, presumptive sentences for certain felony offenders, telephonic search warrants, disposal of seized and recovered property, insanity defense, defense of necessity, joyriding, immunity, and sentencing procedure).

impractical for the legislature's efficiency.

If a stricter one-subject standard would be impractical for the legislature, and if the constitutional initiative provision were intended to provide co-equal law-making power to the people (subject to stated exceptions), we cannot employ a separate and stricter one-subject standard for initiatives. The purposes behind the initiative right — to serve as a check on the legislature and to pass needed laws — are not served if we impose a stricter one-subject standard on the people but allow the legislature to operate under a more liberal rule.[151] In effect, the State asks us to put our judicial thumb on the

---

[151] For example, the parties discuss the 2014 marijuana initiative in their briefs. *See* STATE OF ALASKA, DEP'T OF LAW, OP. ATT'Y GEN., JU2013200236 (June 11, 2013), http://www.law.alaska.gov/pdf/opinions/opinions_2013/2013-005_ JU2013200236.pdf. Although the State describes that initiative as containing "discrete topics," the initiative created new chapters to Titles 17 and 43 of the Alaska Statutes. *See* STATE OF ALASKA, DEP'T OF ELECTIONS, INITIATIVE PETITIONS APPEARING ON BALLOT, Petition Application (Apr. 16, 2013), http://www.elections.alaska.gov/petitions/ 13PSUM/13PSUM-Proposed-Law.pdf. The initiative also had provisions on topics as varied as: (1) personal use; (2) personal cultivation; (3) public use; (4) operation of marijuana-related facilities; (5) creation of a Marijuana Control Board in the Department of Commerce, Community, and Economic Development; (6) adoption of regulations; (7) local control; (8) marijuana taxation administration and enforcement. JU201320236 at 1. The attorney general concluded that the initiative bill was confined to the subject of "the production, taxation, sale, and use of marijuana." *Id.* at 4. The lieutenant governor certified the initiative and it later was approved by the voters at an election. STATE OF ALASKA, DEP'T OF ELECTIONS, INITIATIVE PETITIONS APPEARING ON BALLOT, Ballot Measure No. 2 — 13PSUM: An Act to tax and regulate the production, sale, and use of marijuana (Nov. 4, 2014), http://www.elections.alaska.gov/Core/doc/bml/BM2-13PSUM-ballot-language.pdf. This likely would not have happened under the State's proposed stricter one-subject test.

The Committee also cites an Attorney General Opinion regarding a cruise ship initiative. *See* STATE OF ALASKA, DEP'T OF LAW, OP. ATT'Y GEN., 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 (Oct. 6, 2003), http://www.law.alaska.gov/pdf/opinions/opinions_2003/03-019_ 663030179.pdf. The initiative was resubmitted after the attorney general initially

(continued...)

scale to limit the people's constitutional check against legislative inaction, limiting the people's law-making power to only piecemeal legislation.[152]

With all this in mind, we turn to our framework for deciding whether to overrule precedent. When we are asked to overrule our precedent, the importance of stare decisis cannot be overstated: "[S]tare decisis is a practical, flexible command that balances our community's competing interests in the stability of legal norms and the need to adapt those norms to society's changing demands."[153] A party seeking reversal bears the "heavy threshold burden of showing compelling reasons for reconsidering the prior ruling."[154] "We will overrule a prior decision only when clearly convinced that the

---

[151]    (...continued)
concluded it violated the one-subject rule. *Id.* at 1. The attorney general reviewed the resubmitted initiative petition and concluded it satisfied the one-subject rule: "The proposed bill covers taxes, discharge permits, gaming, unfair trade practices, and other issues, and generally unites these topics with the consistent theme of regulation of commercial passenger vessels." *Id.* at 3. Voters later approved the initiative at an election. STATE OF ALASKA, DEP'T OF ELECTIONS, INITIATIVE PETITIONS APPEARING ON BALLOT, Ballot Measure No. 2 — 03CTAX: An Act providing for taxation of certain ship vessels, pertaining to certain vessel activities and related to ship vessel operations taking place in the marine waters of the State of Alaska" (Aug. 22, 2006), http://www.elections.alaska.gov/petitions/03CTAX/ 03CTAXB.pdf. Again, this likely would not have happened under the State's proposed stricter one-subject test.

[152]    *Cf.* Alaska Const. art. XII, § 11 ("Unless clearly inapplicable, the law-making powers assigned to the legislature may be exercised by the people through the initiative, subject to the limitations of [a]rticle XI.").

[153]    *Pratt & Whitney Canada, Inc. v. Sheehan*, 852 P.2d 1173, 1175 (Alaska 1993); *see also Thomas v. Anchorage Equal Rights Comm'n*, 102 P.3d 937, 943 (Alaska 2004) ("The stare decisis doctrine rests on a solid bedrock of practicality: 'no judicial system could do society's work if it eyed each issue afresh in every case that raised it.'" (quoting *Pratt*, 852 P.2d at 1175)).

[154]    *Thomas*, 102 P.3d at 943.

rule was originally erroneous or is no longer sound because of changed conditions and that more good than harm would result from a departure from precedent."[155] We need address only the first prong of the test to reject the State's argument.

The State dismisses *Short* and *Yute Air* as "originally erroneous," speculating that in both cases we felt compelled to uphold the measures because voters already had approved them. As we noted earlier, *Short*'s statement about the one-subject rule was dictum;[156] *Yute Air* is the controlling authority, and we focus our attention on that decision.

*Yute Air* descended from *Gellert*, in which Justice Fitzgerald dissented.[157] The dissent believed the combination of Fairbanks flood control and coastal small boat harbor projects was a "good example" of improper logrolling because the bill sought to "gather voter support for a project in the interior of Alaska by linking it with harbor projects dear to the coastal towns and villages."[158] The dissent argued that the majority's test would render the one-subject rule "meaningless," although admitting that it is "difficult to determine whether a group of projects has one subject matter."[159]

We expressed concern about the feasibility of the one-subject rule in

---

[155]    *Id.* (quoting *State, Commercial Fisheries Entry Comm'n v. Carlson*, 65 P.3d 851, 859 (Alaska 2003)). "A decision may prove to be originally erroneous if the rule announced proves to be unworkable in practice." *Pratt*, 852 P.2d at 1176; *see also In re Hospitalization of Naomi B.*, 435 P.3d 918, 926-27 (Alaska 2019) (discussing "unworkable in practice" scenario).

[156]    *See* discussion *supra* pp. 18-20.

[157]    *Gellert v. State*, 522 P.2d 1120, 1124 (Alaska 1974) (Fitzgerald, J., dissenting).

[158]    *Id.*

[159]    *Id.*

subsequent cases,[160] and in *Yute Air* we directly addressed whether there was a more workable alternative.[161] In that case Justice Moore dissented, stating that we "mistakenly continued to give the rule such an extremely liberal interpretation that the rule has become a farce."[162] The dissent noted that the one-subject rule's purpose was "to restrain 'log[]rolling' in the legislative process"[163] and that the lax one-subject rule "actually allows disparate subjects to be enfolded within the cloak of a broad generality."[164] The dissent also believed that in the initiative context "[t]here is a greater danger of logrolling, or the deliberate intermingling of issues to increase the likelihood of an initiative's passage, and there is a greater opportunity for 'inadvertence, stealth and fraud' in the enactment-by-initiative process."[165]

The dissent presented two proposals for replacing our current one-subject standard. In one footnote the dissent suggested applying a "functional test," adopted by the Florida Supreme Court, when considering whether an initiative violates the one-

---

[160] *See Short v. State*, 600 P.2d 20, 25 (Alaska 1979) (rejecting appellant's due process argument, but noting that "the one-subject rule would not assure voters sufficient notice of the objectives of a particular piece of legislation if diluted to require little or no connection between subjects joined therein; so construed, it could also conceivably deprive the voter of his or her liberty of choice, forcing acceptance of an objectionable proposition by coupling it with an unrelated meritorious objective which the voter earnestly wants to support"); *see also State v. First Nat'l Bank of Anchorage*, 660 P.2d 406, 414-15 (Alaska 1982) (discussing permissibility of legislation covering broad subject).

[161] 698 P.2d 1173, 1180-81 (Alaska 1985).

[162] *Id.* at 1182 (Moore, J., dissenting).

[163] *Id.* at 1183.

[164] *Id.*

[165] *Id.* at 1184.

subject rule.[166]  Courts applying the "functional test" consider whether the proposed initiative was merely an "aggregation of dissimilar provisions (designed) to attract support of diverse groups to assume its passage" and whether the "initiative performs the functions of different branches of government."[167]  The dissent also offered a "more useful" *Gellert* test:  "A stronger and clearer version . . . would read as follows:  An act or initiative should embrace one subject.  By this we mean that all matters treated should be logically connected."[168]  The dissent notably suggested that this new test apply prospectively to *both* the legislature and the initiative.[169]  But the dissent acknowledged that this new wording of the *Gellert* test would "not automatically turn this court away from the Anything Goes approach of the 'merely . . . germane' standard embraced in *Gellert*."[170]

We responded to the dissent, acknowledging the argument that we had given the legislature too much deference in *Gellert*'s application of the one-subject rule.[171]  But we explained that we had not found a more workable stricter standard[172] and

---

[166]    *Id.* at 1183 n.4.

[167]    *Id.* (quoting *Evans v. Firestone*, 457 So. 2d 1351, 1354 (Fla. 1984)).

[168]    *Id.* at 1185.

[169]    *Id.* at 1187.

[170]    *Id.* at 1185-86 (alteration in original).

[171]    *Id.* at 1180-82 (majority opinion).

[172]    Our discussions about how strictly to apply the one-subject rule are not unique to Alaska.  Debates over the one-subject rule's application abound in state courts across the country.  *See* Briffault, *supra* note 55, at 1636-40 (discussing application of single-subject rules in various states); Robert D. Cooter & Michael D. Gilbert, *A Theory of Direct Democracy and the Single Subject Rule*, 110 COLUM. L. REV. 687 (2010) (continued...)

-42-                                                              7460

that the dissent's proposed Florida rule would make enacting uniform codes prohibitively difficult.[173] We emphasized the stability and predictability of our prior decisions, noting

---

[172]    (...continued)
(examining state court applications of single-subject rule and proposing "separable preferences" approach); Daniel Hays Lowenstein, *California Initiatives and the Single-Subject Rule*, 30 UCLA L. REV. 936, 936-53 (1983) (discussing application of single-subject rule in California). As we explained in *Yute Air*, it remains unclear whether there are workable stricter standards. 698 P.2d at 1180-81; *see* Cooter & Gilbert, *supra*, at 687 (noting that "[l]ogic and language cannot yield a precise definition of 'subject' "); Lowenstein, *supra*, at 963-65, 975 (concluding that California's analogous " 'reasonably germane' test best serves the single-subject rule's language and purposes"); *see also* Matsusaka & Hasen, *supra* note 95 (analyzing more than 500 judicial votes in single-subject cases during period 1997-2006 and concluding that "in states with aggressive enforcement of the single[-]subject rule, decisions are well predicted by whether or not a judge is likely to agree with the substance of the initiative under review based on his or her partisan affiliation").

[173]    *Yute Air*, 698 P.2d at 1181 ("Many laws embracing a single subject direct more than one governmental department to act. For example, nearly all uniform codes have provisions directing judicial and executive action and thus would have to be passed in separate enactments under the Florida rule."). Florida is known for its "aggressive application" of its one-subject rule. Daniel H. Lowenstein, *Initiatives and the New Single Subject Rule*, 1 ELECTION L.J. 35, 41-42 (2002). But Florida at times has been criticized for inconsistent application of its one-subject rule. *See, e.g.*, *Advisory Op. to Att'y Gen. — Ltd. Political Terms in Certain Elective Offices*, 592 So.2d 225, 231 (Fla. 1991) (Kogan, J., concurring in part and dissenting in part) ("[W]e traditionally have stated that [Florida's one-subject rule for initiatives proposing constitutional amendments] requires an initiative to contain a logical and natural 'oneness of purpose' . . . . [T]he erratic nature of our own case law construing [this provision] shows just how vague and malleable this 'oneness' standard is. What may be 'oneness' to one person might seem a crazy quilt of disparate topics to another. 'Oneness,' like beauty, is in the eye of the beholder; and our conception of 'oneness' thus has changed every time new members have come onto this Court." (citation omitted)); Rachael Downey, et al., *A Survey of the Single Subject Rule as Applied to Statewide Initiatives*, 13 J. CONTEMP. LEGAL ISSUES 579, 590-96 (2004) (examining Florida's application of one-subject rule over time).

that both the initiative sponsors and the lieutenant governor had relied on *Gellert*.[174] We further reiterated that "an initiative is an act of direct democracy guaranteed by our constitution" and "should be liberally construed."[175] We believed stricter application of the one-subject rule to the initiative "ignore[d] the explicit constitutional directive" of article XII, section 11.[176] We therefore concluded we would continue applying the *Gellert* test equally to the legislature and the initiative.[177]

We reaffirm our *Yute Air* conclusion. Contrary to the State's speculation that we were overly swayed by the initiative's passing at the previous general election held just before our decision was issued, our reasoning focused solely on whether the initiative's provisions satisfied our *Gellert* one-subject standard.[178] Although the State also now argues that the one-subject rule is "procedural" rather than "substantive" and that the Alaska Constitution permits the State's alternative, stricter test, that argument — even assuming its validity — demonstrates nothing erroneous in our decision to apply the one-subject test equally to initiatives and legislation. When the State originally argued *Yute Air* before us, it argued for the same conclusion;[179] we clearly explained in our decision why we rejected the dissent's approach. And our subsequent *Croft* decision,

---

[174]    *Yute Air*, 698 P.2d at 1181.

[175]    *Id.*

[176]    *Id.*

[177]    *Id.*

[178]    *See id.* at 1175, 1180-82.

[179]    As discussed earlier at pages 22-23 and note 92, the State affirmatively argued in support of our *Yute Air* holding, citing article XII, section 11 and asserting that the Alaska Constitution provides equal law-making powers to the legislature and to Alaska's people. The State has not attempted to explain why its constitutional interpretation suddenly has changed from one of substance to one of procedure.

striking down a proposed initiative after application of the *Gellert* test, demonstrates that, although imperfect, our one-subject-rule test is workable in practice.[180]

We see no basis to overrule *Yute Air* and create a different one-subject rule for the people's right to make laws through the initiative process. The approach we announced in *Yute Air* is consistent with the Alaska Constitution, and the State's proposed approach runs counter to the people's constitutional law-making right. The State has not met its burden to show that our *Yute Air* holding was originally erroneous.

## C.   The Initiative Passes The *Gellert* Test.[181]

We turn now to the Committee's proposed initiative.[182] The proposed initiative includes a "findings and intent" section setting out the goal of "increasing transparency, participation, access, and choice" in the electoral process. The initiative aspires to ensure that wealth does not unduly influence state elections and that Alaskans "know in a timely manner the source, quantity, timing, and nature of resources used to influence candidate elections in Alaska." The section further provides that "[i]t is in the

---

[180]   *See Croft v. Parnell*, 236 P.3d 369 (Alaska 2010).

[181]   As noted earlier, the State conceded at oral argument that the initiative would pass the *Gellert* one-subject-rule test if it were legislation rather than an initiative. Given our rulings above that our existing *Gellert* framework applies to the initiative, we could dispense with this section of the opinion. But for transparency we will outline the analysis. Again, we review the superior court's decision de novo. *See supra* note 131.

[182]   We have a limited role in determining whether a proposed initiative is in proper form by satisfying the one-subject rule. We do not decide the legal or other merits of the initiative's substance. *Kodiak Island Borough v. Mahoney*, 71 P.3d 896, 899 (Alaska 2003) (explaining that "pre-election review [of initiative petitions] is limited to determining 'whether [the initiative] complies with the particular constitutional and statutory provisions regulating initiatives'; whereas, '[g]eneral contentions that the provisions of an initiative are unconstitutional are justiciable only after the initiative has been enacted by the electorate' " (second and third alterations in original) (footnote omitted) (quoting *Brooks v. Wright*, 971 P.2d 1025, 1027 (Alaska 1999))).

public interest" to adopt an open, nonpartisan primary system and a general election ranked-choice voting system. The extremely detailed initiative title similarly explains that the act would, among other things, "prohibit[] the use of dark money by independent expenditure groups working to influence candidate elections in Alaska and requir[e] additional disclosures by these groups."

The parties agree that the initiative would make three substantive changes to Alaska election law: (1) replacing the party primary system with an open, nonpartisan primary; (2) establishing ranked-choice voting in the general election; and (3) mandating new disclosure and disclaimer requirements to existing campaign finance laws. A plain reading of the initiative shows that its provisions embrace the single subject of "election reform" and share the nexus of election administration. All substantive provisions fall under the same subject matter of elections, seek to institute an election reform process, and, as the superior court noted, change a single statutory title, Title 15, Alaska's Elections Code.

Although the initiative's inclusion of terms such as "dark money" and "true source" arguably could evoke "strong feelings" in voters,[183] those feelings relate to the election reform topic; the initiative's text shows no transparent attempt to garner voter support through completely unrelated provisions. And nothing suggests the title is misleading or the initiative is so unclear that it gives rise to a concern about confusion, fraud, or inadvertence.[184] The initiative's provisions substantively modify current election laws such that we can logically conclude they fall under the one subject of "election reform."

---

[183]     *See Croft*, 236 P.3d at 374.

[184]     *See Gellert v. State*, 522 P.2d 1120, 1122 (Alaska 1974) (noting that one-subject rule "guard[s] against inadvertence, stealth and fraud in legislation" (quoting *Suber v. Alaska State Bond Comm.*, 414 P.2d 546, 557 (Alaska 1966))).

The State argues that the three substantive changes to the election laws "are not actually 'connected' through cross-references or other logical reliance" and that "[n]one depends on the others to function properly." The State's argument focuses primarily on whether voters could vote separately on each substantive legal reform. But neither *Gellert* nor *Croft* requires severing every provision that, in the abstract, could be voted on separately. And we have never required that a proposed law's "subject" be the most minute and discrete possible. We recognized instead in *Gellert* the convenience of classifying related matters under a single bill.[185] In *Short* we further emphasized the need to give "great latitude in enacting comprehensive legislation" and cautioned that "[t]he one-subject provision *should not* be construed so as to unnecessarily restrict the scope and operation of laws, or to *multiply their number excessively*."[186] And in *Croft* we rejected the initiative not simply because its provisions were severable, but because they were distinct subjects and lacked a nexus.[187] Thus, the question is not whether the initiative could be split into separate measures, but rather whether the various provisions "embrace some one general subject."[188]

The initiative's provisions are logically related. The substantive changes relate to elections and are encompassed within Title 15. The open, nonpartisan primary

---

[185] *See id.* at 1122-23.

[186] 600 P.2d 20, 23 (Alaska 1979) (emphases added); *see also Evans ex rel. Kutch v. State*, 56 P.3d 1046, 1069 (Alaska 2002) (considering broad tort reform legislation and stating "that 'what constitutes one subject for purposes of article II, § 13 is broadly construed,' and that only a 'substantial and plain' violation . . . will lead us to strike down legislation on this basis" (quoting *State v. First Nat'l Bank of Anchorage*, 660 P.2d 406, 415 (Alaska 1982))).

[187] *See* 236 P.3d at 374.

[188] *Gellert*, 522 P.2d at 1123 (quoting *Johnson v. Harrison*, 47 Minn. 575, 50 N.W. 923, 924 (1891)).

system changes the status quo by forwarding four candidates for voters to rank in the general election by ranked-choice voting. These two substantive changes are interrelated because they together ensure that voting does not revert to a two-candidate system.[189] The Committee also argues that "when moving away from party primary elections and allowing for more candidates on the general election ballot, it becomes more important than ever that voters have adequate and accurate information about who is paying for campaign communications to influence their vote." A provision increasing voter knowledge logically relates to election reform.

Unlike the *Croft* sponsors' juxtaposing oil industry taxation, campaign finance, and Permanent Fund Dividend payments into one "clean elections" initiative,[190] this initiative's provisions are properly classified under "election reform" as a matter of both logic and common sense. They all relate to the elections process and share the common thread of reforming current election laws. We can logically conclude that the various initiative provisions substantively change (or reform) the state's elections.

The *Gellert* test, despite its imperfections, has guided our one-subject-rule precedent for over 40 years. The subject "election reform" is more constricted than subjects we previously have upheld.[191] The initiative satisfies the *Gellert* test; it now is

---

[189]    Section 37 of the proposed initiative amends current law to clarify: "The primary election does not serve to determine the nominee of a political party or political group but serves only to narrow the number of candidates whose names will appear on the ballot at the general election. . . . [O]nly the four candidates who receive the greatest number of votes for any office shall advance to the general election."

[190]    *See* 236 P.3d at 374.

[191]    *See, e.g.*, *Evans ex rel. Kutch*, 56 P.3d at 1069-70 ("civil actions"); *Yute Air Alaska, Inc. v. McAlpine*, 698 P.2d 1173, 1181 (Alaska 1985) ("transportation"); *First Nat'l Bank of Anchorage*, 660 P.2d at 415 ("land"); *Short*, 600 P.2d at 24 ("general
(continued...)

up to the people to decide whether the initiative's provisions should become law.

## V.    CONCLUSION

We AFFIRM the superior court's ruling and judgment reversing the lieutenant governor's certification denial of the Committee's proposed initiative.

---

[191]    (...continued)
public safety function of protecting life and property"); *North Slope Borough v. Sohio Petroleum Corp.*, 585 P.2d 534, 546 (Alaska 1978) ("state taxation"); *Gellert*, 522 P.2d at 1123 ("cooperative water resources development").